# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**CAROLYNNE TILGA and**
**ADELLA ABEITA,**

       Plaintiffs,

v.                                    CIV No. 14-256 JAP/RHS

**UNITED STATES OF AMERICA,**
**DISMAS CHARITIES, INC., d/b/a**
**DIERSEN CHARITIES ALBUQUERQUE,**
**and WILL J. PRATER, in his individual capacity,**

       Defendants.

## MEMORANDUM OPINION AND ORDER

In DEFENDANT UNITED STATES OF AMERICA'S MOTION AND MEMORANDUM TO DISMISS FOR LACK OF JURISDICTION (Motion to Dismiss) (Doc. No. 37), the United States asks the Court to dismiss Plaintiffs' Federal Tort Claims Act (FTCA) claims against it for lack of subject matter jurisdiction.[1] The United States sets out three arguments in support of dismissal: 1) the intentional tort exception bars Plaintiffs' claims; 2) the discretionary function exception immunizes the government from Plaintiffs' claims; and 3) Plaintiffs failed to exhaust their administrative remedies with respect to the claim that the United States negligently placed Plaintiffs at Defendant Dismas Charities, Inc.'s (Dismas) halfway house in Albuquerque, New Mexico.

In PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION AND MEMORANDUM TO DISMISS FOR LACK OF JURISDICTION (Response) (Doc. No. 48), Carolynne Tilga and Adella Abeita (Plaintiffs) assert that this Court has jurisdiction over their FTCA claims and that all of their claims should proceed

---

[1] Defendant Dismas does not oppose the United States' Motion to Dismiss.

against the United States. In the REPLY IN SUPPORT OF DEFENDANT UNITED STATES'
MOTION TO DISMISS (Reply) (Doc. No. 54), the United States again argues that both the
intentional tort exception and the discretionary function exception bar Plaintiffs' negligence
claims against the United States.

## Background

In the COMPLAINT FOR DAMAGES FOR PERSONAL INJURY AND CIVIL
RIGHTS VIOLATIONS PURSUANT TO THE FEDERAL TORT CLAIMS ACT (FTCA) AND
42 U.S.C. § 1983 (Complaint) Plaintiffs assert three claims against the United States:
1) negligence in placing Plaintiffs in custody at Dismas (Count I); 2) negligence in contracting
with Dismas for the placement of prisoners at Dismas (Count II); and 3) negligence in providing
proper training, supervision, and management of the contract with Dismas (Count III). Plaintiffs
seek damages against the United States "in an amount of $3,000,000 for each Plaintiff."
Complaint at 21. Plaintiffs also request compensatory and punitive damages against Defendants
Dismas and Will J. Prater. *Id.*

The allegations, as they pertain to the Court's jurisdiction, are largely undisputed
although Plaintiffs raise additional allegations that they contend the United States neglected to
include in its list of Material Jurisdictional Allegations. Motion to Dismiss at 2–3, Response at
3–4. The Court summarizes below the pertinent jurisdictional allegations taken from the
Complaint and the parties' briefing.

## Pertinent Jurisdictional Allegations

Plaintiffs are former federal inmates, whom the United States Bureau of Prisons (BOP) placed at Dismas to finalize their criminal sentences. Complaint ¶¶ 33–35, 70–71. Defendant Prater,[2] an employee of Dismas, harassed and sexually abused Plaintiffs while Plaintiffs were at the Dismas halfway house in 2013.[3] *Id.* ¶¶ 11, 34–67, 71–99. Plaintiffs suffered damages and injuries as a result of both Defendant Prater's tortious conduct and the United States' negligence. *Id.* 131, 140, 141, 146.

Dismas owns and operates the halfway house that is doing business as Diersen Charities Albuquerque. *Id.* ¶¶ 6-7. "A halfway house is a place inmates of BOP are sent by BOP to begin the process or reintegration into society after serving a sentence of incarceration." *Id.* ¶ 19. The Albuquerque Dismas halfway house opened in March 2005 and is "operated under contract with the United States BOP for federal prisoners such as Plaintiffs." *Id.* ¶¶ 8-9, 18. Dismas "operates 26 residential re-entry programs and related services" in a number of states, including New Mexico. *Id.* ¶ 17. At all pertinent times, "Defendant United States of America through the BOP entered into a contract and agency relationship with Dismas, to set up and maintain residential reentry centers, for federal prisoners finalizing their federal sentences." *Id.* ¶ 94.

A 2010 amendment of the pertinent BOP contract mandated that BOP staff review Dismas' services to ensure contract compliance. *Id.* ¶ 22; Motion to Dismiss at 2.[4] The contract modification included an evaluation provision regarding Dismas personnel and a paragraph addressing "whether the contractor [Dismas] was ensuring competent staff have been recruited,

---

[2] On July 24, 2014, the Court entered Default Judgment against Defendant Prater who did not file an answer to the Complaint and who has not entered an appearance. Doc. No. 29. The Court set a hearing on damages but vacated the hearing in response to the parties' requests and has not yet rescheduled the hearing.. The United States filed a Motion to Vacate Default Judgment against Defendant Prater (Doc. No. 41) that is now briefed.

[3] The Court granted in part and denied in part Defendant Dismas' Motion to Dismiss. Plaintiff's claim of negligent hiring, retention, training, and supervision of Defendant Prater against Dismas was not dismissed. MEMORANDUM OPINION AND ORDER (Doc. No. 24).

[4] The United States contends that the amendment to the contract was issued on March 5, 2013. Reply at 5 n.2.

trained, and retrained." Complaint ¶ 22. The BOP failed to ensure that Dismas was in compliance with the contract and failed to maintain "close supervision and monitoring of the activities, staff training, and facilities operated by Dismas . . . ." *Id.* ¶¶ 23, 99. An additional 2010 amendment to the contract included requirements of the Prison Rape Elimination Act of 2003 (PREA) which, according to Plaintiffs, indicated that the United States had knowledge of sexual misconduct at Dismas' halfway house in Albuquerque. *Id.* ¶ 24.

The Dismas "facility layout and manner in which female and male inmates were housed and maintained were ripe for a sexual assault to occur, as it created a potentially dangerous condition for vulnerable female inmates." *Id.* ¶ 25. "The lack of adequate management and implementation of policies and guidelines [] made it highly likely that a sexual assault would occur." *Id.* ¶ 26. The United States "was aware of problems throughout the United States, with rampant sexual abuse, drug abuse and inappropriate staff and resident contact in several Dismas Charities Inc., facilities." *Id.* ¶ 95. Despite reports nationwide from 2007–2012 involving incidents of drug and sexual abuse in other Dismas facilities, the United States "chose to enter into and remain in a contract with Dismas [] [Albuquerque] for the purpose of providing residential reentry facilities for federal prisoners. . . ." *Id.* ¶ 97.

The United States owed Plaintiffs a non-delegable duty to provide them with safe and suitable quarters, free from dangers of sexual harassment and assault, while Plaintiffs were in the government's custody. *Id.* ¶¶ 101, 112, 113. Despite known dangers at Dismas, the BOP placed Plaintiffs in custody at Dismas and "exposed them to an environment ripe for sexual abuse and harassment." *Id.* ¶ 96. The United States failed to exercise reasonable care in placing Plaintiffs at Dismas, and its negligence proximately caused injuries to Plaintiffs. *Id.* ¶¶ 114–119, 124–126, 128–131; Counts I, II, and III.

**Pertinent Legal Standards**

**I.      Standard of Review**

      A.      <u>Rule 12(b)(1) Lack of Subject Matter Jurisdiction</u>

The United States seeks dismissal of Plaintiffs' negligence claims for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) based on its position that exceptions to the FTCA's waiver of immunity bar Plaintiffs' claims. Motion to Dismiss at 3. Motions to dismiss under Rule 12(b)(1) may take two forms. If a party attacks the facial sufficiency of the complaint, the Court accepts the allegations of the complaint as true. *Hernandez v. United States*, __ F. Supp. 2d __, 2014 WL 803774 at *2 (D. Colo. Feb. 28, 2014). In contrast, a factual attack "goes beyond the factual allegations of the complaint and presents evidence in the form of affidavits or otherwise to challenge the court's jurisdiction." *Rural Water Dist. No. 2 v. City of Glenpool,* 698 F.3d 1270, 1272 n.1 (10th Cir. 2012) (citations omitted). When a party challenges the factual assertions regarding subject matter jurisdiction, a court may consider evidence outside the pleadings in making its own findings of fact, without converting the motion to dismiss to a motion for summary judgment. *Id.*

A wrinkle in the jurisdictional analysis occurs when jurisdictional issues raised in a Rule 12(b)(1) motion are intertwined with the case's merits. If this occurs, the court must resolve the motion under either Rule 12(b)(6) or Rule 56. *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1129–1130 (10th Cir.), *cert. denied*, 528 U.S. 964 (1999). In *Franklin*, similar to this case, the United States asserted that an exception to the FTCA's waiver of the government's sovereign immunity foreclosed the plaintiff's claims against the United States. The *Franklin* Court found that the subject matter jurisdiction question was intertwined with the merits of the case and was, therefore, subject to analysis under Rule 12(b)(6). *Id.*

In *Olsen v. United States ex rel. Dep't of the* Army, 144 F. App'x 727, 730–31 (10th Cir. Aug. 4, 2005) (unpublished), the Tenth Circuit Court of Appeals reached a similar result, although it determined that the district court should have treated the government's motion as a motion for summary judgment because the district court considered matters outside the parties' pleadings. In *Olsen*, as is true here, the United States argued that the plaintiff's claims were barred by the FTCA's intentional tort exception. The *Olsen* Court acknowledged that a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) or Rule 56 motion if resolution of the jurisdictional question is intertwined with the merits of the case. *Id.* (citation omitted). The *Olsen* Court found that the jurisdictional question was intertwined with the merits where the court's subject matter jurisdiction was dependent on the same statute that supported the plaintiff's substantive claims, *i.e.,* exceptions to the FTCA waiver of the government's immunity.

The Court concludes, consistent with the reasoning in *Olsen*  and *Franklin,* that the jurisdictional question is closely connected to the merits of Plaintiffs' case. *See Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997) ("The determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues.") (citation omitted)). *See also Dry v. United States,* 235 F.3d 1249, 1253 (10th Cir. 2000) (reviewing a district court's 12(b)(1) dismissal under Rule 12(b)(6) where the parties relied on legal arguments outside the complaint in relation to subject matter jurisdiction). Because there are no affidavits or other evidence attached to the parties' briefing,[5] the Court will

---

[5] Two of the three documents that the United States attached to its Motion to Dismiss are copies of the administrative claims that Plaintiffs filed with the United States Department of Justice in mid-2013. Doc. Nos. 37-1, 37-2. These attachments go to the United States' third argument that Plaintiffs failed to exhaust their administrative remedies. The Court addresses that argument *infra*. The third document is a part of the United States' amended contract with Dismas addressing "Evaluation of Contractor Performance . . .". The parties do not appear to dispute the amendment or the language itself. *See* Response at 2-3.

not convert the Rule 12(b)(1) Motion to Dismiss to a Rule 56 Motion for Summary Judgment. Under these circumstances, however, the Court is required to convert the United States' Rule 12(b)(1) Motion to Dismiss into a Rule 12(b)(6) Motion to Dismiss.

B.      Rule 12(b)(6) Failure to State a Claim

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A pleading does not require "detailed factual allegations," but it requires more than mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement." *Id.* (internal citation and quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff must 'nudge [ ][its] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (citation omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

Under the Rule 12(b)(6) standard, the Court accepts as true all well pleaded allegations in the Complaint and construes all reasonable inferences in the light most favorable to the plaintiff. *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). However, the Court does not accept conclusory allegations as true. *Khalik v. United Airlines,* 671 F.3d 1188, 1191 (10th Cir. 2012).

7

## II.   Federal Tort Claims Act (FTCA): Waiver of Immunity and Exceptions

### A.   FTCA's Partial Waiver of Immunity

The United States is immune from suit unless it has consented to be sued or unless there is a waiver of its immunity. *United States v. Mitchell*, 445 U.S. 535, 538, *reh'g denied*, 446 U.S. 992 (1980). The FTCA, enacted in 1946, "was designed primarily to remove the sovereign immunity of the United States from suits in tort." *Levin v. United States*, ___ U.S. ___, 133 S.Ct. 1224, 1228 (2013) (citation omitted). The FTCA constitutes a partial waiver of the federal government's sovereign immunity. *Hernandez*, 2014 WL 803774 at *3. A waiver of immunity is strictly construed in favor of the sovereign. *Hart v. Dep't of Labor ex rel. United States*, 116 F.3d 1338, 1339 (10th Cir. 1997). *See also United States v. Williams*, 514 U.S. 527, 531 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity").

The FTCA waives the United States' immunity as to claims against it for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The FTCA's limited waiver of immunity is subject to enumerated exceptions at 28 U.S.C. §§ 2680(a)–(n). If an exception applies, the United States retains its immunity and the Court lacks subject matter jurisdiction over the claim.

The United States invokes two exceptions under the FTCA in arguing that its immunity is preserved as to Plaintiffs' negligence claims against it: (1) § 2680(h), the intentional tort exception; and (2) § 2680(a), the discretionary function exception. "When invoking a waiver, the plaintiff bears the burden of showing that an unequivocal waiver of sovereign immunity exists,

and that none of the statute's waiver exceptions apply to this particular claim." *Hernandez*, 2014 WL 803774 at *3 (*citing James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992)).

      B.     <u>Intentional Tort Exception</u>

     An exception to the FTCA's waiver of immunity, referred to as the "intentional tort exception," precludes a plaintiff from bringing claims against the government "arising out of" intentional torts. *Millbrook v. United States*, 133 S.Ct. 1441, 1444 (2013) (citing 28 U.S.C. § 2680(h)). The intentional tort exception preserves the United States' immunity from suit for "[a]ny claim *arising out of* assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* (emphasis added).

     Many courts have addressed how to apply the intentional tort exception and its "arising out of" language. The United States Supreme Court plurality decision in *Shearer v. United States*, 473 U.S. 52 (1985) represents the prevailing view in the Tenth Circuit and in other circuits. *Franklin v. United States*, 992 F.2d 1492, 1498, 1499 (10th Cir. 1993). In *Shearer*, the Supreme Court held that the FTCA does not waive the government's immunity for any claims arising out of an assault or battery. Where it is clear that a plaintiff's claim arises out of a battery, "[n]o semantical recasting of events can alter the fact that the battery was the immediate cause of [the decedent's] death and consequently, the basis of [the plaintiff's] claim." *Shearer*, 473 U.S. at 54–55.

> [Plaintiff] cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like [plaintiff's] that sound in negligence [against the government] but stem from a battery committed by a Government employee.

*Id.* (emphasis in original). Thus, the Court lacks subject matter jurisdiction over a claim that "sounds" in negligence but is merely an attempt to plead around the "arising out of" language by recasting the claim as one for a negligent-failure-to-prevent-the-battery.

Following *Shearer*, the Supreme Court decided *Sheridan v. United States*, 487 U.S. 392, 400–03 (1988), recognizing "one category of battery-related cases that falls outside the preclusive compass of § 2680(h)." The *Sheridan* Court permitted a negligence claim to proceed against the United States, even though the negligence claim arose out of an incident of battery. In *Sheridan*, the plaintiffs were shot and injured by an off-duty, intoxicated serviceman near a naval hospital. They brought an FTCA action against the government, asserting that the United States was liable for the negligence of three naval corpsmen who had previously observed the assailant was armed and extremely intoxicated and yet had allowed the assailant to leave the hospital with a weapon without reporting him. *Id.*

The *Sheridan* Court observed that the words "any claim arising out of" an intentional tort were "unquestionably broad enough to bar all claims based *entirely* on an assault or battery." But, the effect of those words was less clear when they applied to a claim that arose out of two tortious acts, one being the assault or battery, and the other being an act of negligence. *Id.* at 398–99. The Court noted that it was "both settled and undisputed that in at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the Government for negligently allowing the assault to occur." *Id.* Thus, *Sheridan* has been described as carving out an "exception to an exception to an exception to a general rule." *CNA v. United States*, 535 F.3d 132, 148 (3d Cir. 2008). The general rule is sovereign immunity, the first exception is the FTCA's limited waiver of the government's immunity, the second exception is the intentional tort exception that reinstates government immunity, and the third

exception is the narrow category of cases, identified in *Sheridan*, which may proceed against the United States. The third category is sometimes known as the "independent affirmative duty" doctrine. *LaFrancis v. United States*, 66 F. Supp. 2d 335, 339 (D. Conn. 1999).

Unlike Plaintiffs' claims against Defendant Prater, who was a non-government employee, *Sheridan* involved claims pertaining to conduct of government employees. The import of this distinction is not always clear. However, relying on two earlier decisions, *Muñiz v. United* States, 374 U.S. 150 (1963) and *Panella v. United States*, 216 F.2d 622 (2d Cir. 1954), the *Sheridan* Court agreed with Judge (later Justice) Harlan's reasoning in *Panella*, that the intentional tort exception only applied to claims that would be authorized by the basic waiver of sovereign immunity, i.e., to claims involving intentional torts of *government* employees. In other words, since an assault by a non-government employee could not provide a basis for a claim under the FTCA, it followed that the intentional tort exception could not apply to such an assault since the exception "only applies in cases arising out of assaults by federal employees." *Sheridan*, 487 U.S. at 400. Thus, even though *Sheridan* involved federal employees' conduct, the case is cited for the proposition that the intentional tort exception does not apply to assaults and batteries by non-government employees. *Sandoval v. United States*, 980 F.2d 1057, 1059 (5th Cir. 1993). *See, e.g.,* 2 Lester Jayson & Robert Longstreth, *Handling Federal Tort Claims* §§ 13.06 [1][a] and 13.06[2] (13–48, 13–90) (2014 ed.) (collecting cases standing for the proposition that the intentional tort exception does not extend to cases where the assailant is not a government employee).

It is noteworthy that *Sheridan* relied on *Muñiz* and *Panella*, both of which involved assaults by inmates rather than by government employees. Most other decisions interpreting the intentional tort exception involve conduct by a government employee. The *Sheridan* Court

explained that two different theories could explain why Muñiz's claim did not "arise out of" an assault by an inmate.

> First, it might be assumed that since [the plaintiff] alleged an independent basis for tort liability–namely, the negligence of the prison officials–the claim did not arise solely, or even predominantly, out of the assault. Rather, the attention of the [factfinder] is focused on the Government's negligent act or omission; the intentional commission is simply considered as part of the causal link leading to the injury.

*Sheridan*, 487 U.S. at 399. Based on this view, the assailant's individual involvement did not give rise to the government's liability, "but antecedent negligence by Government agents could, provided . . . that similar negligent conduct would support recovery under the law of the State …." *Id.*

The *Sheridan* Court, however, relied exclusively on the second theory that allowed Muñiz's negligence claim to proceed against the government. The Court explained that the second theory, while narrower, was not inconsistent with the first theory. *Id.* at 400. In describing the second theory, the *Sheridan* Court observed that Judge Harlan, in *Panella* emphasized the statutory language at issue –the FTCA waiver of immunity expressly permitted actions for personal injuries caused by the conduct of government employees who were acting within the scope of their employment. *Id.* at 400–01. Because the off-duty serviceman in *Sheridan* was not acting within the scope of his employment when he shot the plaintiff, his actions alone would not give rise to government liability. *Id.* But, where the plaintiff alleged the negligence of other government employees who allowed a foreseeable assault and battery to occur, the negligence claim could proceed against the United States. *Id.* Based on those allegations, the negligence of other government employees was "entirely independent of [the assailant's] employment status." *Id.* at 401. Thus, the intentional tort exception to the FTCA was not applicable. *Id.* at 403.

*Sheridan* has been subject to various commentaries. In *Franklin*, the Tenth Circuit Court interpreted *Sheridan* to carve out a category of negligence claims against the government that could proceed where the government's liability was based on its "breach of a duty owed [to] the victim that [was] independent of its relationship, if any, to the perpetrator." *Franklin*, 992 F.2d at 1498. In *Purcell v. United States*, 137 F. App'x 158, 160 (10th Cir. June 28, 2005), *cert. denied*. 546 U.S. 1171 (2006), the Tenth Circuit Court found that *Sheridan* turned on two points: (1) a given injury that could be traced back to more than one type of tortious conduct, and (2) the exclusions in § 2680 that were tort-specific, so that the exclusion of one type of tort claim did not require exclusion of another. In *Leleux v. United States*, 178 F.3d 750, 757 (5th Cir. 1999), the Fifth Circuit summarized *Sheridan* as standing for the principle "that negligence claims related to a Government employee's § 2680(h) intentional tort may proceed where the negligence arises out of an independent, antecedent duty unrelated to the employment relationship between the tortfeasor and the United States."

In the treatise, *Handling Federal Tort Claims*, the authors observed that *Sheridan* "explicitly ruled that if the antecedent negligence of a government employee results in an excluded intentional tort committed by a non-government employee, or by a government employee not acting within the scope of his employment, the [intentional tort] exception is not applicable, and liability for the antecedent negligence [against the government] may result." 2 *Handling Federal Tort Claims* § 9.05[2][h] (9-137). Even before the *Sheridan* decision, courts had consistently held that when a non-government employee committed an intentional tort, the intentional tort exclusion did not protect the government from liability where the government is under an obligation to protect others from risk of harm posed by the assailant and negligently failed to do so. *Id.* (citation omitted).

1)      *The United States' Position*

Briefly, the United States, relying on *Shearer*, argues that the FTCA's intentional tort exception preserves its sovereign immunity for all three negligence claims because the claims "arise out of" the commission of intentional torts. In other words, the negligence claims are "part and parcel of" the intentional torts allegedly committed by Defendant Prater. The United States asserts that Plaintiffs cannot "plead around th[e] [immunity] barrier by recasting a battery claim as a negligent failure-to-prevent the battery claim." Motion to Dismiss at 5.

In addition, the United States contends that Defendant Prater's status as an employee of an independent contractor or as a non-governmental employee does not defeat the application of the intentional tort exception. Reply at 8–11. According to the United States, "*Sheridan* put an end to the distinction that Plaintiffs champion, the employee-non-employee distinction." Reply at 8. The United States relies on a decision by the Second Circuit Court which considered the same issue and held that "technicalities," such as whether an alleged tortfeasor was a government employee or an independent contractor, have no place in the FTCA analysis. *Guccione v. United States*, 847 F.2d 1031, 1035–36 (2d Cir. 1988), *cert. denied,* 493 U.S. 1020 (1990).

2)      *Plaintiffs' Position*

Plaintiffs cite *Sheridan* for the proposition that their negligence claims against the United States fit "the one category of battery-related cases that falls outside the preclusive compass of § 2680(h)." In other words, Plaintiffs' negligence claims "arise[] out of an incident of battery but [are] in no way contingent on the perpetrator's federal employment status . . . ." Response at 7 (*citing Sheridan*).

Plaintiffs negligence claims involve allegations that the United States breached duties to Plaintiffs that were independent of the United States' relationship, if any, to Defendant Prater,

who was not a government employee. Response at 7. Plaintiffs argue that courts do not consider

a plaintiff's injuries to have "arisen out of" an intentional tort when a plaintiff alleges negligence

by the United States, "coupled with Intentional Torts of non-Government (Federal) Employees."

*Id.* Plaintiffs allege that the intentional torts committed by Defendant Prater were the result of the

United States' negligent action of placing Plaintiffs in a Dismas facility when the United States

knew or should have known of various instances of unsafe conditions, including sexual abuse, at

Dismas facilities, Complaint ¶¶ 104–111; and, failing to provide proper management and

supervision at the Albuquerque Dismas halfway house. Thus, according to Plaintiffs, the United

States' negligence did not arise from the tortfeasor's conduct; instead, the government's

negligence was antecedent to Defendant Prater's tortious conduct. Response at 8.

　　　　　3)　　*Analysis*

　　　　In *Franklin,* the United States Supreme Court articulated the key inquiry as "can an

FTCA plaintiff escape the bar of § 2680(h) by arguing that the battery was the natural

consequence of prior governmental negligence?" *Franklin*, 992 F.2d at 1495, 1498. For the two

reasons set out below, the Court answers this question in the affirmative as to Plaintiffs'

negligence claims against the United States.

　　　　　　a.　　Plaintiffs' negligence claims against the United States do not
　　　　　　　　　arise solely out of Defendant Prater's alleged tortious conduct

　　　　While Plaintiffs allege that Defendant Prater's tortious conduct caused injuries, they also

have made sufficient, independent allegations of antecedent negligence against the United States

or its employees. For example, Plaintiffs allege that the United States can be held liable for its

negligence in failing to provide safe living conditions for federal inmates at Dismas and to

properly manage and supervise conditions at Dismas. Plaintiffs contend that Defendant Prater's

alleged assault and battery of Plaintiffs was foreseeable because the United States knew or

should have known of unsafe conditions at Dismas, and that the United States did not exercise reasonable care in placing Plaintiffs at Dismas. Plaintiffs also assert that the United States owed them a duty to place them in safe and suitable quarters while they were in federal custody and that the United States breached that duty. Plaintiffs allege that the United States' negligence was the cause in fact or proximate cause of their damages and injuries. *Compare Franklin*, 992 F.2d at 1499 (a pleading without allegations of proximate cause sufficient to tie a defendant's alleged negligence to the injury will not support a cause of action).

Plaintiffs have alleged claims that arise out of two sets of tortious acts, one being the intentional torts by Defendant Prater and the other being negligent acts or omissions by government officials. In other words, Plaintiffs' alleged injuries can be traced back to more than one type of tortious conduct. The negligence claims do not rely on the same factual allegations as the intentional tort claims. Plaintiffs' negligence claims against the United States, as alleged, do not arise solely or predominantly out of Defendant Prater's alleged tortious conduct. Rather, this is one of those narrow category of cases, recognized in *Sheridan,* where the trier of fact's attention is focused on the Government's antecedent and separate negligent acts or omissions. Because the negligence arises out of the United States' independent, antecedent duties that are unrelated to the employment relationship between the tortfeasor and the United States, the intentional tort exception does not apply. *See Sheridan*, 487 U.S. at 401 (allegations of negligence of other government employees who allowed a foreseeable assault and battery may provide a basis for government liability that is entirely independent of the tortfeasor's employment status).

      b.     The intentional tort exception does not apply to Defendant Prater's actions because he is not a government employee

 As explained, the FTCA's general waiver of immunity applies only to government employees. Because Defendant Prater is not a government employee, his alleged tortious conduct falls outside the scope of the general waiver of immunity and the intentional tort exception does not apply. *Sheridan*, 487 U.S. at 400–01.

     The United States argues that *Sheridan* put an end to the employee/non-employee distinction in terms of the intentional tort exception. Yet, the United States provides quoted language from *Sheridan* that is incomplete. Reply at 8. Moreover, the authors of the treatise, *Handling Federal Tort Claims*, § 9.05[2][h] (9-137) have collected many cases through 2014 on this precise issue and continue to conclude that the intentional tort exception never comes into play unless the allegations first give rise to a tort that falls within the scope of the FTCA's general waiver of immunity in 28 U.S.C. § 1346(b). According to the *Sheridan* Court's interpretation of *Panella*, the employee/non-employee distinction, along with the question of whether the tortfeasor was acting within the scope of employment, do still make a difference. "Since an assault by a person who was not employed by the Government could not provide the basis for a claim under the FTCA, the [intentional tort] exception could not apply to such an assault; rather, the exception only applies in cases arising out of assaults by federal employees." *Sheridan*, 487 U.S. at 400.

     The United States' reliance on *Guccione*, a Second Circuit Court opinion, is not persuasive. First, *Guccione* is not binding authority on this Court. Next, the United States bases its argument on an excerpt from *Guccione* without providing the full context. For example, the United States asserts that the Second Circuit Court considered the issue of independent contractor status and held that "technicalities," "such as whether an alleged tortfeasor was an

employee of the United States or an independent contractor, have no place in the FTCA

analysis." Reply at 9. The *Guccione* Court also stated with respect to its previous holding in

*Panella*–

> In *Panella*, the fact that the assailant was not a federal employee
> warranted emphasis only because it served as a useful way to
> demonstrate that, despite the claim's mixed allegations of both
> negligence and intentional conduct, the plaintiff's "negligence
> action is not merely an alternative form of remedy to an action for
> assault but negligence is rather the essence of the plaintiff's claim."
> The absence of any employment or work-related relationship
> between the assailant and the federal government provided a
> simple, unequivocal assurance that the negligent supervision claim
> really was the "essence" of the claim and not a surreptitious way of
> seeking to hold the United States liable for the intentional torts of
> those in some way carrying out the Government's business.
> *Panella* thus established a clear rule of easy application: where the
> intentional tortfeasor is in no sense carrying out the Government's
> business, the claim against the United States for negligent
> supervision of the assailant does not "arise out of" an intentional
> tort within the meaning of section 2680(h).

*Guccione*, 847 F.2d at 1035 (internal citations omitted). Thus, even in *Guccione*, the Second

Circuit Court recognized a category of cases where the intentional tort exception did not apply

based on the tortfeasor's employment status. Similar to this reasoning, Plaintiffs have sufficiently

alleged that Defendant Prater, a non-government employee, was "in no sense" carrying out the

United States' business when he allegedly engaged in tortious conduct at Dismas. Stated

differently, the essence of Plaintiffs' claims against the United States is that the government

acted negligently.

   In addition, the Fifth Circuit Court's short opinion in *Sandoval v. United States*, 980 F. 2d

1057 (5th Cir. 1993) is more factually analogous and more persuasive. In *Sandoval*, an inmate

intentionally, albeit mistakenly, beat the plaintiff who was also an inmate. Sandoval was serving

a federal sentence and was released into the custody of the United States Marshal by writ of

habeas corpus ad testificandum. While being transferred, Sandoval was housed in the Central Texas Violators Facility (CTVF), which was operated by Wackenhut Corporation, a contractor to the federal government. During Sandoval's custody at CTVF, a Wackenhut guard intentionally began antagonizing Bobby Salazar, another inmate at CTVF. Salazar became infuriated and attacked Sandoval believing Sandoval was behind the offensive conduct. Sandoval suffered injuries and brought a negligence claim against the United States, alleging that the United States Marshal was negligent in placing him in CTVF where he was exposed to improper conduct of guards and other prisoners. Sandoval alleged that the U.S. Marshal breached a duty to provide for his safety during his incarceration at CTVF. *Id.* at 1059.

In *Sandoval*, the magistrate judge relied on *Shearer* in finding that Sandoval's claim "arose out of" an assault or battery and that the intentional tort exception barred Sandoval's negligence claim against the United States. *Id.* at 1058–59. The Fifth Circuit Court disagreed, reasoning that "[w]hile this may be true for the intentional acts of Government employees, this exclusion does not apply to the intentional torts of others." *Id.* at 1059 (*citing Sheridan*, 487 U.S. at 400–03). The *Sandoval* Court concluded that the intentional tort that injured Sandoval was not perpetrated by a government employee; thus the "exclusion of § 2680(h) is not relevant to the case *sub judice.* ... [T]he use of this exclusion to justify ... dismissal was improper." *Id.*

While *Sandoval* is not binding on this Court, the allegations are sufficiently analogous to those in this case that the Court finds *Sandoval* persuasive authority on the question of whether the employee/non-employee distinction is alive and well. The *Sandoval* Court recognized that Sandoval might have a heavy burden in being able to prove negligence by the United States. However, Sandoval had alleged sufficient facts to allow his claim to proceed. *Id.*

The same is true here. The Court concludes, at this stage of the proceeding, that Plaintiffs have provided sufficient non-conclusory jurisdictional facts to raise a right to relief against the United States above the speculative level. *See Twombly,* 550 U.S. at 555. In other words, after construing all well pleaded allegations and all reasonable inferences in the light most favorable to Plaintiffs, it is plausible that the intentional tort exception does not deprive the Court of subject matter jurisdiction over Plaintiffs' negligence claims against the United States.[6] Accordingly, the Court will deny the United States' Motion to Dismiss as to the argument that the intentional tort exception prohibits Plaintiffs' negligence claims.

 B.  Discretionary Function Exception

The FTCA's waiver of sovereign immunity is limited by the discretionary function exception, which precludes claims against the United States that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "If the discretionary function exception applies to the challenged conduct, the United States retains its sovereign immunity and the district court lacks subject matter jurisdiction to hear the suit." *Domme v. United States*, 61 F.3d 787, 789 (10th Cir. 1995). Again, the court strictly construes exceptions to the FTCA in favor of the sovereign. *Kiehn v. United States*, 984 F.2d 1100, 1102 n.2 (10th Cir. 1993) (citation omitted).

The discretionary function exception has been described as "mark[ing] the boundary between Congress' willingness to impose tort liability upon the United States and its desire to

---

[6] The Court's decision is no comment on the strength or merits of Plaintiffs' negligence claims. If appropriate, those claims may be subject to further review on a motion for summary judgment, where the parties will have to provide more specific evidence concerning, e.g., the conditions of the Dismal halfway house and the United States' alleged knowledge of those conditions, the United States' alleged duty to Plaintiffs and how the United States breached a duty, the United States' role in the management or supervision of Dismas, and the legal effects of the contractual relationship between the United States and Dismas and its employees.

protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, *reh'g denied*, 468 U.S. 1226 (1984). This exception intends to protect policy making by the executive and legislative branches of government from judicial "second guessing." *Id.* at 814. If applicable, the discretionary function exception preserves the government's immunity even if the government employees were negligent. *Aragon v. United States*, 146 F.3d 819, 822–23 (10th Cir. 1998).

In deciding whether challenged conduct falls within the discretionary function exception, the Tenth Circuit Court applies the two-part test set forth in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

> First, we ascertain the precise governmental conduct at issue and consider whether that conduct was "discretionary," meaning whether it was "a matter of judgment or choice for the acting employee." *Berkovitz*, 486 U.S. at 536. Conduct is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.*
>
> If the first element of the *Berkovitz* test is satisfied, we then consider the second element—whether the decision in question is one requiring the exercise of judgment based on considerations of public policy. *Id.* at 536–37. In so doing, we do not consider the employee's "subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).
>
> If both the first and second elements of the *Berkovitz* test are met, the discretionary function exception to the waiver of sovereign immunity applies. Stated another way, if a plaintiff can establish that either element is not met, the plaintiff may proceed because the exception does not apply. *Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir.2008).

*Garcia v. United States*, 533 F.3d 1170, 1176 (10th Cir. 2008) (applying the two-part test).

Plaintiffs argue that while they bear the burden of proving that a FTCA claim may proceed "under the waiver of sovereign immunity," the United States must satisfy the "ultimate burden of proving the applicability of the Discretionary Function Exception." Response at 10. In support of this position, Plaintiffs cite a number of non-binding opinions from other circuit courts. In *Garcia*, however, the Tenth Circuit Court observed that the "discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Garcia*, 533 F.3d at 1175 (citation omitted). *See also Sydnes*, 523 F.3d at 1185 ("the burden under our case law to present evidence of a discretion-constraining regulation or policy resides with the plaintiffs"). Thus, Plaintiffs have the burden of establishing that the discretionary function exception does not apply.

Plaintiffs also assert that "there are sufficient genuine facts establishing that the discretionary function does not apply" and that this Court should allow discovery to proceed. Response at 10, 11. The Court is not deciding the United States' Motion to Dismiss under summary judgment standards. Moreover, Plaintiffs did not present any evidence with their Response and are unable to raise genuine issues of fact without submitting evidence tending to show that the United States' challenged conduct did not involve an element of judgment or choice, or that its actions were not susceptible to policy analysis. Thus, the Court continues to evaluate the Motion to Dismiss under Rule 12(b)(6) standards. Accordingly, the pertinent inquiry is whether Plaintiffs have alleged facts sufficient to support a finding that the United States' challenged actions, in relation to specific statutes, regulations, policies, or contractual provisions, were not discretionary or that the government's conduct was not susceptible to policy analysis.

    1)  *The United States' Position*

  The United States identifies several statutes that Plaintiffs may invoke in support of their negligence claims against it: 1) 18 U.S.C. § 4042, which requires the BOP to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States;" 2) 18 U.S.C. § 4081, which addresses the planning and sizes of federal penal and correctional institutions; 3) 18 U.S.C. § 3621(b), which concerns minimum standards of health and habitability that the BOP must meet with respect to available penal or correctional facilities; and, 4) the Prison Rape Elimination Act of 2003 (PREA), which creates duties to monitor Dismas' performance under its contract with the United States. In addition, the United States recognizes Plaintiffs' reliance on the terms of a "private contract" between Dismas and the BOP as a source of specific, non-discretionary actions that BOP was required to take. Motion to Dismiss at 9.

  The United States contends that none of the identified statutes create specific, mandatory duties and that the statutes at issue set forth no particular conduct that the BOP must engage in or avoid. According to the government, the first three pertinent statutes, 18 U.S.C. §§ 4042, 4081, and 3621(b) each involve elements of judgment or choice, and that any statutory responsibilities created by these enactments are committed to the government's discretion. Motion to Dismiss at 4. The United States also asserts that the PREA does not serve as a source of law sufficiently specific to defeat the application of the discretionary function exception. With respect to the written contract between Dismas and the BOP, the United States disagrees with Tenth Circuit precedent that a voluntary contract with a third party can impose non-discretionary duties on government employees. Motion to Dismiss at 9 n.4. Even if true, the government contends the written contract does not require the BOP to take specific, non-discretionary actions. The United

States further argues that the challenged conduct, as related to the specified statutes or contractual provisions, is grounded in policy considerations. Thus, the United States argues that Plaintiffs' negligence claims fail to meet either prong of the *Berkovitz* test, and are, therefore, barred by the discretionary function exception.

2)   *Plaintiffs' Position*

Plaintiffs assert that the Court "should reject the government's attempt to force its conduct within the parameters of the discretionary function exception in order to avoid liability." Response at 9. Yet, Plaintiffs first raised the possibility that the United States would invoke the discretionary function exception by alleging in the Complaint that the United States' "failures cannot rationally be deemed the exercise of a discretionary function." Complaint ¶ 116. Moreover, nothing prevents the government from raising the discretionary function exception even if Plaintiffs disagree as to its application.

Plaintiffs further assert that the United States should not escape liability for the negligent acts or omissions of its employees who do not obey federal law or who do not use "due care" in the exercise of duties under federal law. Plaintiffs contend that "[w]hen the allegation is negligence in implementing a statute or regulation, there is no exercise of due care and thus no discretionary function exception." Response at 13. Plaintiff's argument is not entirely clear. Moreover, to the extent that Plaintiffs are asserting that negligence or alleged breach of a duty of care alone is sufficient to defeat application of the discretionary function exception, that is contradicted by existing law. *See Aragon*, 146 F.3d at 822–23  (exception applies even if the government employees were negligent). *Garcia,* 533 F.3d at 1176 (question of negligence is irrelevant because the discretionary function exception applies "whether or not the discretion involved be abused.").

24

Plaintiffs next argue that the Court can end its analysis with the first prong of the *Berkovitz* test because the "course of action the government followed in this case when housing and placing inmates is provided for by federal statutes and in the guidelines proscribed in the contracts." Response at 11. Plaintiffs contend that 18 U.S.C. §§ 4042, 4081, 3621(b) and the PREA all require a course of action for federal employees to follow that is specific and mandatory. Plaintiffs further refer to allegations in the Complaint that the contract between Dimas and the BOP provided for "estimated requirements" with respect to the gender breakdown of inmates." *Id.* Plaintiffs anticipate that discovery will reveal more specifics about the "standards in place that directed how [inmate] placements were to be made" and that discovery will show that the United States had "no discretion in placement in this case" since Diersen is the only facility in New Mexico that the United States contracted with to house its inmates. Response at 11.

Should the Court reach the second prong of the *Berkovitz* test, Plaintiffs contend that the challenged governmental decisions, i.e., the BOP's "decision to place Plaintiffs in a certain type of facility with a certain ratio and criteria" are not grounded in policy considerations. Response at 12.

          3)     *Analysis*

                a.     18 U.S.C. §§ 4042, 4081, and 4042(a) each provide for use of the BOP's discretion, and any mandated obligations are grounded in policy considerations

Title 18 U.S.C. § 4042 provides:

> The Bureau of Prisons, under the direction of the Attorney General, shall—(1) have charge of the management and regulation of all Federal penal and correctional institutions;(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3)  provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

Title 18 U.S.C. § 4081 states:

The Federal penal and correctional institutions shall be so planned and limited in size as to facilitate the development of an integrated system which will assure the proper classification and segregation of Federal prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions.

Title 18 U.S.C. § 3621(b) requires the BOP to "designate the place of a prisoner's imprisonment." The BOP may consider the following factors in deciding where to place a prisoner:

(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence–(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

1.      The statutes permit discretionary decisions

Numerous courts have held that 18 U.S.C. § 4042 does not create specific, non-discretionary duties for BOP officials to follow. In other words, the statutes are general in nature, involve an element of choice, and leave the implementation of certain duties to the discretion of BOP officials. *Mathison v. United States*, Civil Action No. 13–cv–00110–PAB–BNB, 2014 WL 717153, *7 (D. Colo., Feb. 24, 2014) (unpublished) (finding, however, that increasing the volume of prison's sound system to the point of hurting inmates' ears was not grounded in policy considerations); *McFarland v. Warden,* 557 F. App'x 915, 916–17 (11th Cir. Mar. 3, 2014)

(unpublished) (regarding § 4042 obligations, prison officials exercised discretion in determining

how many officers to have on duty, where to position them, and whether to use metal detectors),

*cert. denied*, 135 S.Ct. 237 (2014); *Huff v. Neal*, 555 F. App'x 289, 297–98 (5th Cir. Jan. 27,

2014) (unpublished) (because § 4042 does not prescribe a specific course of action, the BOP had

discretion to decide how best to fulfill its duty under the statute); *Calderon v. United States*, 123

F.3d 947, 950 (7th Cir. 1997) ("While it is true that [Section 4042(a)(2) ] sets forth a mandatory

duty of care, it does not . . . direct the manner by which the BOP must fulfill this duty.");

*Thrower v. United States*, 528 F. App'x 108, 111 (3rd Cir. June 3, 2013) (unpublished) ("[w]hile

the BOP's conduct at issue is governed by a federal statute requiring the BOP to provide for the

"protection" and "safekeeping" of inmates, *see* 18 U.S.C. § 4042(a)(2), the statute leaves

implementation of these duties to BOP officials' discretion" ).

Courts have also held that neither § 4081 nor § 3621 imposes mandatory, non-

discretionary duties on the part of the BOP. In *Cohen v. United States*, 151 F.3d 1338, 1343

(11th Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999), the Court examined all three statutes relied

on by Plaintiffs, specifically concluding that §§ 4081 and 3621 did not impose a non-

discretionary duty of care on the BOP in classifying prisoners and placing them in institutions.

To the contrary, these statutes provided the BOP with elements of choice. *Id.* Section 3621(b)

gave the BOP "ample room for judgment by listing a non-exhaustive set of factors for the BOP

to consider and leaving to the BOP what weight to assign to any particular factor." *Id. See also*

*Brown v. Federal Bureau of Prisons*, 2014 WL 321214, at *2, Civil Action No. 11–cv–03191–

WYD–BNB (D. Colo. Jan. 29, 2014) (unpublished) (addressing 18 U.S.C. §§ 4042, 4081, and

3621 and finding that prison officials had discretion with respect to inmate assignments and

housing).

The Tenth Circuit Court of Appeals does not appear to have addressed the discretionary function exception with respect to the above-mentioned three statutes. However, the language of the statutes, along with persuasive case law, support a finding that none of the three statutes prescribe specific, mandatory actions that the BOP must take. Plaintiffs' conclusory argument, Response at 11–12, that "[t]here is not discretion to deviate from the proscribed conduct" at issue in the three statutes is unavailing. The Court concludes that all three statutes involve discretionary decisionmaking by the government.

2.      Decisions under the statutes implicate policy concerns

The Court must next decide if the BOP's judgment in adhering to the statutory obligations is the kind that the discretionary function exception was designed to shield. *See Berkovitz*, 486 U.S. at 536. In other words, is the BOP's discretion in carrying out the statutory duties "susceptible to policy analysis"? *Gaubert*, 499 U.S. at 325. In *Duke v. Dep't of Agric.*, 131 F.3d 1407, 1410 (10th Cir. 1997), the Tenth Circuit Court recognized the inherent problems involved in applying the second *Berkovitz* prong.

> [N]early every governmental action is, to some extent, subject to policy analysis–to some argument that it was influenced by economics or the like. An added difficulty is that a failure to act can be a policy decision; and a failure to think about acting may still be susceptible to policy analysis.

The *Duke* Court acknowledged that this analysis could eviscerate the second step in *Berkovitz*. *Id.* at 1411. *Duke*, therefore, explained that the court must ask if the government decision or non-decision implicates "the exercise of social, economic, or political [judgment]." *Id.* (citation omitted).

Plaintiffs contend that the BOP's actions under the three statutes are not susceptible to policy analysis because "it is not a consideration of public policy that the BOP place Plaintiffs in

a certain type of facility with a certain ratio and criteria–it is instead required by the statutes cited." Response at 12. Plaintiffs' position is unclear. The statutes do not specify where the BOP must place inmates or the gender ratio of inmates at a given facility. Moreover, the statutes clearly allow the BOP and the government to exercise choice by setting forth a number of factors to consider in deciding where to place inmates. 18 U.S.C. § 3621(b). Those enumerated factors implicate social, economic, and political considerations.

For example, Plaintiffs' negligence claims against the United States concern issues of safety of federal prisoners at a halfway house. Plaintiffs allege that the United States did not place them in a safe environment. Decisions where to place different classifications of inmates and how to monitor specific types of prisons and facilities, in order to ensure the safety of inmates, involve economic concerns and the use of limited resources. In addition, § 3621(b) expressly permits the BOP to consider the resources of the facility and the Sentencing Commission's "policy statements" in making placement decisions.

In *Gaubert,* 499 U.S. at 324, the United States Supreme Court presumed that actions or decisions were "grounded in [public] policy" where a statute allowed government officials to exercise discretion. Moreover, numerous courts have held that a prison's decisions regarding security matters are grounded in public policy. *See, e.g.*, *Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (decisions about how to respond to a reported threat upon an inmate implicate social and public policy considerations); *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998) (prison officials' decisions about security levels, available resources, and classification of inmates "are inherently grounded in social, political, and economic policy."); *Green v. United States*, Civ. A. No. 94–5706, 1995 WL 574495, at *3 (E.D. Pa. Sept. 22, 1995) (unpublished) ("FTCA cases have uniformly held that prison decisions

29

regarding security matters are protected by the discretionary function exception.") (collecting cases). *See also Miller v. United States,* 992 F.2d 1223 (Table), 1993 WL 137103, at *1 (10th Cir. 1993) ("The decisions of prison officials during a fight between two groups of prisoners ... remains the type of decision protected by the discretionary function exception to the FTCA.")

In *Cohen*, 151 F.3d at 1344, the Fifth Circuit Court reasoned that decisions about how to classify prisoners and how to choose a place of incarceration were "part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons" (*citing Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators ... should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.")). *See also Threadgill v. United States*, 2011 WL 7429424, at *4, Civil Action No. 11–cv–00094–REB–KMT (D. Colo. Dec. 1, 2011) (unpublished) (inmate placement decisions, even those that ultimately lead to injury, have been routinely found to satisfy the second discretionary function prong "due to the myriad of policy considerations at issue") (citations omitted*), report and recommendation adopted*, 2012 WL 638793 (D. Colo. Feb. 28, 2012).

The Court concludes that the BOP's decisions, in relation to carrying out the statutory duties in 18 U.S.C. §§ 4042, 4081, and 3621, are grounded in policy considerations. Thus, Plaintiffs have failed to demonstrate that any of these three statutes defeat the discretionary function exception.

    b.  The PREA involves discretionary decisions that are grounded in policy considerations

Plaintiffs alleges that the 2010 amendment of the written contract between Dismas and the United States,[7] added a clause addressing the PREA that required specific monitoring tools, "a designated PREA coordinator at Dismas and an audit." Complaint at ¶ 24. According to Plaintiffs, both Dismas and the BOP "failed to follow through with any attempt to truly monitor, audit and eliminate sexual assaults and sexual misconduct at Dismas." *Id.* Plaintiffs argue that the BOP was required to place them in a facility that was in compliance with the PREA's "required monitoring tools, and compliance reports." Plaintiffs further assert that the BOP was to "ensur[e] competent staff have been recruited [sic] trained, and retained." Response at 15.

Plaintiffs apparently recognize that they do not have evidence to show that the United States failed to exercise "due care" or that the BOP violated terms of PREA's supposed requirements with respect to conditions at Dismas. Plaintiffs state they will be seeking discovery of the compliance reports and "other evidence" showing the United States was in violation of the PREA. *Id.*

The PREA established a "zero-tolerance standard" for rape in prisons in the United States. 42 U.S.C. 15602(1). In a Memorandum to executive heads, President Obama required all agencies with federal confinement facilities to implement rules to satisfy requirements of the PREA. 42 U.S.C. § 15601 (May 17, 2012 Presidential Memorandum "Implementing the Prison Rape Elimination Act").

*Doe v. United* States, 2011 WL 1637147, CV. No. 08–00517 BMK (D. Hi. Apr. 29, 2011) (unpublished), *aff'd in part, rev'd in part*, 510 F. App'x 614 (9th Cir. Feb 27, 2013), apparently is the only case involving the BOP's alleged violation of the PREA in relation to the

---

[7] The United States argues that the PREA requirements cited by Plaintiffs were not in force at the time the BOP entered into a contract with Dismas. Reply at 5.

application of the discretionary function exception. In *Doe*, a former inmate brought a claim under the FTCA against the United States and a federal correctional officer, based on allegations that a prison employee sexually assaulted her. The *Doe* Court had a transcript of the FBI's interview of the correctional officer, the BOP's "Program Statement's Standards of Employee Conduct," and the plaintiff's expert's testimony. The expert opined that the United States and the correctional officer breached a duty to protect the plaintiff by failing to protect her from sexual assault as mandated by the PREA. *Id.* at *4, 6.

The *Doe* Court reasoned that the PREA did not direct "the manner in which Defendants must fulfill [the Act's] goals." In addition, the *Doe* Court observed that while the Attorney General, as of that date, had not filed a final rule adopting national standards for the detection, prevention, and reduction of prison rape, the draft final rule appeared to be discretionary in nature. *Id.* at *7. The District Court concluded, based on language of the PREA and the draft final rule, that the pertinent agencies and facilities had discretion when making staffing decisions in a prison setting. There was no federal statute, regulation, or policy, notwithstanding the PREA, that was "specific and mandatory as to inmate supervision." *Id.* Thus, the *Doe* Court denied the plaintiff's motion for reconsideration and motion to amend.

The parties disagree whether the Ninth Circuit Court of Appeals' subsequent opinion in *Doe*, 510 F. App'x 614 (9th Cir. Feb. 27, 2013), reversed the District Court's April 29, 2011 decision or whether it reversed a previous District Court decision in *Doe*. Response at 16; Reply at 6. The Ninth Circuit Court determined that the discretionary function exception did not bar the plaintiff's claim; however, the Circuit Court decision did not address the PREA claim that apparently was added after the District Court's first opinion. Moreover, the *Doe* Circuit Court emphasized evidence that was before the district court indicating that a correctional officer was

32

told in training not to go alone to an area that lacked video surveillance with a female inmate. That correctional officer's statement about training suggested that the prison "had a mandatory policy against putting female inmates in the same kind of situation" in which the correctional officer left plaintiff with the abuser. Because there were genuine issues of material fact as to whether a prison policy created mandatory or discretionary duties, the Ninth Circuit Court found the district court had erred in dismissing the action under the discretionary function exception. *Id.* at *2.

The *Doe* decisions provide little guidance either because the District Court had more evidence before it or because the Ninth Circuit Court did not address a PREA claim. Instead of trying to follow the confusing district and appellate court decisions in *Doe*, this Court looks to the language of the PREA, findings related to the PREA, the Presidential Memorandum to agency heads, regulations applicable to a facility like Dismas, 28 C.F.R. § 115.211, and the June 20, 2012 final rule, 77 F.R. 37106–01. The Court concludes that the PREA leaves the agency substantial discretion in applying the PREA and in determining the best measures to combat sexual abuse in a prison setting. Stated differently, the PREA is not the source of specific, mandatory directives, such that the BOP "ha[d] no rightful option but to adhere to the directive[s]." *Berkovitz*, 486 U.S. at 536.

For example, the overview of the PREA final rule states: "in … recognizing the unique characteristics of individual facilities, agencies, and inmate populations, the Department [of Justice] has endeavored to afford discretion and flexibility to agencies to the extent feasible." 77 F.R. 37107. The overview also explains–"while the standards aim to include a variety of best practices, they do not incorporate every promising avenue of combating sexual abuse, due to the

need to adopt national standards applicable to a wide range of facilities, while taking costs into

consideration." *Id.*

> Due to the great variation across facilities in terms of size, physical
> layout, and composition of the inmate population, it would be
> impractical to require a specified level of staffing. Likewise,
> mandating a subjective standard such as "adequate staffing" would
> be extremely difficult to measure. Instead, the final standard
> requires that prisons and jails use their best efforts to comply with
> the staffing plan on a regular basis and document and justify any
> deviations.

77 F.R. 37108. In addition, the executive Memorandum explained that because each agency was

in the best position to determine how to specifically implement the PREA, that agency was

tasked with developing rules and regulations that would ensure compliance with the PREA. *Id.*

According to pertinent regulations, an agency must have a written plan addressing PREA

concerns and must employ a PREA coordinator "with sufficient time and authority to develop,

implement, and oversee agency efforts to comply with the PREA standards in all of its

community confinement facilities." 28 C.F.R. § 115.211. An agency must develop a written plan

for each facility that addresses PREA concerns. 28 C.F.R. § 115.213(a). In creating that plan, the

agency considers the physical layout of a facility, the composition of the resident population, the

prevalence of substantiated and unsubstantiated incidents of sexual abuse, and "any other

relevant factors." *Id.* Clearly, the regulations provide the BOP with discretion in developing a

written plan.

Although the PREA and its related regulations require the agency to take certain actions,

the language of the statute and regulations allow an agency significant discretion in how best to

prevent incidents of sexual abuse at a particular facility. Plaintiffs have made, at most,

generalized allegations regarding violations of the PREA. The allegations are vague with respect

to whether Plaintiffs contend that the BOP failed to hire a "PREA coordinator," as required by

the PREA, or if they allege that the BOP has not developed a written plan in accordance with the PREA. *See* Complaint at ¶ 24. Although Plaintiffs allege the BOP failed to "follow through with any attempt to truly monitor" sexual misconduct at Dismas, Plaintiffs' allegations are too general to raise their claims, based on the PREA, from "conceivable to plausible."

The Court concludes that the PREA provides the BOP with discretion to create an appropriate plan at each facility to combat sexual abuse and misconduct. The BOP's decisions and related PREA plan are grounded in policy considerations. Thus, Plaintiffs have failed to demonstrate that the PREA defeats the discretionary function exception.

c.   Written contract between Dismas and the BOP

Plaintiffs contend that Dismas was acting "pursuant to directives and standards set forth by the United States...." Complaint at ¶ 12. These allegations may refer to the written contract between Dismas and the BOP although it is unclear. Plaintiffs allege that the written contract provided for "estimated requirements with respect to gender of inmates of 92 percent male/8 percent female as a 'guaranteed minimum,' and 86 percent male/14 percent female 'estimated maximum.'" *Id.* at ¶ 21. The import of this allegation is not obvious since Plaintiffs do not allege that Dismas failed to adhere to the guaranteed ratios or that the failure to meet certain ratios caused injuries.

Plaintiffs allege that a 2010 amendment to the contract added a clause requiring the BOP to evaluate contractor performance and to review Dismas staff "to ensure compliance and that monitoring reports would be prepared. The [contract] modification also included a provision of evaluation regarding personnel and whether the contractor was 'ensuring competent staff have been recruited, trained, and retained.'" Complaint at ¶ 22. Plaintiffs assert that the BOP failed to ensure that Dismas complied with its contract and failed to ensure competent staff. *Id.* at ¶ 23.

The United States argues that Plaintiffs have inaccurately alleged that the BOP issued the amendment to the contract with Dismas in May 2010. According to the United States, the amendment in question was issued on March 5, 2013, after Plaintiffs were placed at Dismas. In support, the United States refers to Exhibit A "Amendment of Solicitation/Amendment of Contract §§ 3, 18(C) (Mar. 5, 2013)." Reply at 5 n.2. There is no attached exhibit to the briefing or the Complaint that contains the entire contract amendment or §§ 3 and 18(C) of the amendment. Nor is there any attachment to the briefing that states the contract was amended on March 5, 2013. The United States provided a two-page excerpt from the contract amendment primarily addressing the form to be used to review contractor performance. This exhibit indicates the amendment was signed April 30, 2012, before Plaintiffs were placed at Dismas. Motion to Dismiss, Ex. C. The Court is unable to make sense of the United States' argument concerning the dates of the amended contract with Dismas.

The United States also questions whether a voluntary contract between the government and a third party is "a federal statute, regulation, or policy," prescribing a course of action that an employee must follow. Motion to Dismiss at 9 n.4. The United States essentially argues that a voluntary contract is not a statute, or a regulation, or even an official policy. Thus, according to the government, a contract cannot vest non-contracting parties with rights to sue on the contract. *Id.* However, the United States acknowledges the decision in *Bell v. United States*, 127 F.3d 1226, 1229 (10th Cir. 1997), where the Tenth Circuit Court concluded that "voluntarily assumed contractual obligations [could] impose nondiscretionary duties on government employees." Thus, as alleged here, the voluntary contract between Dismas and the BOP may impose mandatory, non-discretionary duties on government employees to take specific actions.

The Court concludes that Plaintiffs' negligence claim, based on the amendment to the contract creating specific responsibilities in hiring, training, and evaluating competent staff at Dismas, survives scrutiny under Rule 12(b)(6), albeit just barely. Based on the allegations in the Complaint and Exhibit C to the Motion to Dismiss, the contract between Dismas and the United States was amended either in 2010 or in 2012, before Plaintiffs were placed at Dismas. Thus, the contract amendments were in effect when Plaintiffs were placed at Dismas in 2013.

The amendments to the contract required the BOP to take specific, non-discretionary actions in hiring and evaluating staff to assure contract compliance. In other words, the BOP did not have the choice to ignore contractual provisions, particularly when the government most likely drafted those terms. The BOP was required to review performance at Dismas to show that Dismas had complied with the terms of the contract. Plaintiffs allege that the BOP failed to take the required action to ensure that Dismas had complied with the contract and to ensure that Dismas hired competent staff. According to the Complaint, Defendant Prater was not fit to be in a position of power over "vulnerable women" and the lack of adequate management at Dismas made it likely for a sexual assault to occur. Complaint at ¶¶ 26, 98, 99. Because Plaintiffs have alleged a contract provision that prescribes a course of action that had to be followed, Plaintiffs do not need to also show that the challenged conduct was not susceptible to policy analysis. *See Sydnes*, 523 F.3d 1183 (if a plaintiff can show that either of the two-part *Berkovitz* test is not met, the discretionary function exception does not apply).

The Court concludes that these allegations nudge Plaintiffs' "claims across the line from conceivable to plausible" and that there is "reason to believe that [Plaintiffs have] a reasonable likelihood of mustering factual support for [the negligence] claims [against the United States]." *Ridge at Red Hawk*, 493 F.3d at 1177. The Court might have reached a different result had the

United States produced the contract provisions at issue and if it had demonstrated through

evidence that the pertinent amendments to the contract were made after Plaintiffs were placed at

Dismas. But, as indicated previously, the United States referred to sections of the amended

contract that it did not attach as an exhibit and to a date of the amended contract that is

contradicted by the government's Exhibit C to the Motion to Dismiss. The Court has little to go

on except for Plaintiffs' allegations and the one excerpt from the amendment of the contract that

is dated April 30, 2012. Therefore, the Court will deny the Motion to Dismiss as it pertains to

Plaintiffs' negligence claims based on obligations found in the written contract and amendments.

## III.    Exhaustion of Administrative Remedies

The Federal Tort Claims Act bars claimants from bringing suit in federal court until they

have exhausted their administrative remedies. *McNeil v. United States*, 508 U.S. 106, 113 (1993).

Title 28 U.S.C. § 2675(a) requires that a claimant provide sufficient notice of a FTCA claim to

the United States. To satisfy the exhaustion requirement under § 2675(a), a claimant must file an

administrative claim that includes a "(1) a written statement sufficiently describing the injury to

enable the agency to begin its own investigation, and (2) a sum certain damages claim."[8] *Cizek v.*

*United States*, 953 F.2d 1232, 1233 (10th Cir. 1992).

> The FTCA's exhaustion requirement provides the agency that
> allegedly caused the injury, which presumably has the best
> information about the claim, a chance to examine and resolve the
> claim before litigation. *See McNeil*, 508 U.S. at 112 n. 7. In order
> for the exhaustion requirement to serve its intended purpose, the
> claimant must provide the agency with detailed facts sufficient to
> investigate the claim. *See Romulus v. United States*, 160 F.3d 131,
> 132 (2d Cir. 1998) (per curiam) ("A claim must be specific enough
> to serve the purpose of the FTCA to enable the federal government
> to expedite the fair settlement of tort claims."); *Murrey v. United*
> *States*, 73 F.3d 1448, 1451-52 (7th Cir.1996) ("[The administrative

---

[8] Each Plaintiff's administrative claim requests a total award of $3,000,000 for personal injuries. Motion to Dismiss, Exhs. A, B. The United States does not contend that Plaintiffs failed to set forth a "sum certain" in their administrative claims.

> complaint] resembles a civil complaint in not requiring a statement
> of legal theories, but differs in requiring a detailed statement of
> facts.").

*Buhl v. U.S.*, 117 F. App'x 39, 42–43 (10th Cir. Nov. 8, 2004) (unpublished).

Plaintiffs filed separate administrative claims with the Department of Justice in relation to their claim that "intentional acts perpetrated by Will Prater and the management at Dismas and Diersen Charities and Bureau of Prisons has caused extreme emotional trauma to [Plaintiffs] ..." and that [t]he intentional acts also resulted in extended physical injury and pain to Ms. Tilga." Motion to Dismiss, Exhs. A, B. On page 2 of both administrative claims, Plaintiffs set out the basis of their claims, including the following paragraph:

> The United States Department of Justice and Federal Bureau of
> Prisons failed to properly train and supervise employees at Diersen
> Charities, acting and working on their behalf. The U.S. Department
> of Justice and Federal Bureau of Prisons also failed to adequately
> inspect these facilities that house Bureau of Prisons detainees. The
> failure to supervise and inspect resulted in the creation of an
> environment ripe for physical, emotional, mental and sexual abuse
> of vulnerable individuals ordered to reside at Diersen Charities
> Half-way House.

*Id.* Exhs. A, B.

The United States argues that Plaintiffs' assertion of their claims and description of the basis of their claims do not sufficiently provide the United States with knowledge "why placement [of Plaintiffs] at the Dismas facility was ill advised or anything else that would alert the United States to Plaintiffs' belated allegation that the United States was negligent in placing Plaintiffs at the Dismas facility." Motion to Dismiss at 14. The United States asserts that Plaintiffs did not adequately give notice to the agency that it should investigate the possibility of potentially tortious conduct, i.e., specifically, a claim of negligent placement of Plaintiffs at Dismas. Reply at 11–12.

In *Estate of Trentadue ex rel. Aguilar v. United* States, 397 F.3d 840, 853 (10th Cir. 2005), the Tenth Circuit Court relied on cases from this jurisdiction for the principle that the FTCA exhaustion and notice provision require "notice of the facts and circumstances underlying a claim rather than the exact grounds upon which plaintiff seeks to hold the government liable." For example, an administrative claim was found sufficient where it notified the agency of the facts of the incident, even if it did not elaborate all possible causes of action. *Id.* (citations omitted). An administrative claim satisfies the notice-of-claim requirement if it informs the agency of a need to "investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages." *Id.* at 852.

The Court concludes that the language contained in the "basis" of Plaintiffs' administrative claims provided adequate notice to the Department of Justice that it should investigate the government's role in placing Plaintiffs at Dismas, where the BOP allegedly "failed to adequately inspect these facilities that house [BOP] detainees[,]" and in monitoring the staff at Dismas in accordance with the contract between Dismas and the BOP. In other words, the administrative claims gave the agency enough facts about the incidents to enable the Department of Justice to conduct a meaningful investigation. Therefore, Plaintiffs have satisfied the exhaustion requirements of 28 U.S.C. § 2675(a).

**Conclusion**

The Court concludes that Plaintiffs' three negligence claims against the United States "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" In so finding, the Court: (1) denies application of the intentional tort exception to bar Plaintiffs' negligence claims against the United States; (2) denies application of the discretionary function exception to bar Plaintiffs' negligence claims against the United States, with respect to

40

mandatory, non-discretionary duties set forth in the written contract between Dismas and the

BOP; and (3) denies the United States' assertion that Plaintiffs' failed to properly exhaust the

their claims under 28 U.S.C. § 2675. Because Plaintiffs satisfied the jurisdictional requirements

of the FTCA with respect to the negligence claims, the Court will deny the United States'

Motion to Dismiss.

IT IS ORDERED that DEFENDANT UNITED STATES OF AMERICA'S MOTION

AND MEMORANDUM TO DISMISS FOR LACK OF JURISDICTION (Doc. No. 37) is

DENIED.

_____

SENIOR UNITED STATES DISTRICT JUDGE