IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CAROLYNNE TILGA and
ADELLA ABEITA,

       Plaintiffs,

v.                                            CIV No. 14-256 JAP/SMV

UNITED STATES OF AMERICA,
DISMAS CHARITIES, INC., d/b/a
DIERSEN CHARITIES ALBUQUERQUE,
and WILL J. PRATER, in his individual capacity,

       Defendants.

MEMORANDUM OPINION AND ORDER

THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

FOR LACK OF SUBJECT MATTER JURISDICTION AND MEMORANDUM IN SUPPORT

(Doc. No. 66) (Motion) argues that the United States is entitled to summary judgment because

Plaintiffs' claims against the government are barred by the discretionary function exception to

the Federal Tort Claims Act's (FTCA) waiver of sovereign immunity. In PLAINTIFFS'

RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S

MOTION FOR SUMMARY JUDGMENT FOR LACK OF SUBJECT MATTER

JURISDICTION AND MEMORANDUM IN SUP[P]ORT  THEREOF [Doc. 66] (Doc. No. 78)

(Response), Plaintiffs contend that the discretionary function exception is inapplicable in light of

mandatory, non-discretionary guidelines, regulations, and contractual obligations that the

government violated. In the UNITED STATES OF AMERICA'S REPLY IN SUPPORT OF ITS

MOTION FOR SUMMARY JUDGMENT (Doc. No. 81) (Reply), the United States asserts that

Plaintiffs have failed to offer evidence of a violation of a specific, mandatory contractual

1

requirement and that the Court should enter summary judgment in favor of the United State on

all of Plaintiffs' negligence claims.

## Background

Plaintiffs are former federal inmates, whom the United States Bureau of Prisons (BOP)

placed at the Dismas Charities, Inc's., d/b/a Diersen Charities (Dismas), Albuquerque halfway

house to finalize their criminal sentences. COMPLAINT FOR DAMAGES FOR PERSONAL

INJURY AND CIVIL RIGHTS VIOLATIONS PURSUANT TO THE FEDERAL TORT

CLAIMS ACT (FTCA) AND 42 U.S.C. § 1983 (Doc. No. 1) (Complaint, ¶¶ 6–7, 33–35, 70–71).

This lawsuit arises from allegations that Defendant Will J. Prater (Prater), a former employee of

Dismas, harassed and sexually abused Plaintiffs while Plaintiffs were at the Albuquerque

halfway house in 2013. *Id.* ¶¶ 11, 34–62, 72–85. Plaintiffs contend that they suffered damages

and injuries as a result of Prater's tortious conduct,[1] Dismas' negligence,[2] and the United States'

negligence. *Id.* ¶¶ 131, 140, 141, 146, 147–155.

Plaintiffs assert three claims against the United States: 1) negligence in placing Plaintiffs

in custody at Dismas (Count I); 2) negligence in contracting with Dismas for the placement of

prisoners at Dismas (Count II); and 3) negligence in providing proper training, supervision, and

management of the contract with Dismas (Count III). Each Plaintiff seeks damages against the

United States in the amount of $3,000,000. *Id.* at 21.

---

[1] Prater has never entered an appearance in this lawsuit, and in July, 2014, the Court entered Default Judgment (Doc. No. 29) in favor of Plaintiffs against Prater. A hearing on damages has not yet been set. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 60) (denying the government's motion to vacate default judgment against Prater and electing to set a damages hearing after the merits of Plaintiffs' claims against Dismas and the United States are decided).

[2] The Court granted in part and denied in part Dismas' Motion to Dismiss (Doc. No. 24), with the result that Plaintiffs' claim of negligent hiring, retention, supervision, and training of Prater (Count VI) proceeds against Dismas. After granting summary judgment in favor of the United States, the negligent hiring claim against Dismas is the only claim that proceeds.

The United States argues that all of Plaintiffs' claims against it must be dismissed because the "complained of actions fall within the discretionary function exception to the FTCA's waiver of sovereign immunity." Motion at 2. In its earlier MEMORANDUM OPINION AND ORDER (Doc. No. 56) denying the United States' Motion to Dismiss, the Court rejected, in part, a similar argument by the United States. The Court held that none of the federal statutes on which Plaintiffs relied in support of their negligence claims against the United States defeated application of the discretionary function exception. However, Plaintiffs' allegations of specific written contractual obligations that imposed mandatory, nondiscretionary duties on government employees to take specific actions withstood Rule 12(b)(6) scrutiny. Doc. No. 56 at 25–38.[3] The Court observed that it might have reached a different result had the United States attached the documents to which it referred in the Motion to Dismiss. *Id.* at 37–38. This time, both parties attach pertinent contractual provisions in support of their arguments.[4]

The Court has carefully reviewed the pertinent law, briefing, and exhibits. For the following reasons, the Court will grant Defendant United States' Motion for Summary Judgment and dismiss for lack of subject matter jurisdiction all of Plaintiffs' negligence claims against the United States.

---

[3] The United States believes that the Court previously dismissed Plaintiffs' negligent placement and negligent selection claims. Reply at 6. However, that is not accurate. In its earlier opinion, the Court found that the statutes relied on by Plaintiffs did not support these two negligence claims. The Court denied the United States' Motion to Dismiss "as it pertains to Plaintiffs' [three] negligence claims based on obligations found in the written contract and amendments." Doc. No. 56 at 38, 40–41.

[4] After the Court denied the United States' Motion to Dismiss, the United States filed a Second Motion to Stay or Limit Discovery. United States Magistrate Judge Stephan M. Vidmar granted the United States' Second Motion, noting that the United States had agreed to produce limited discovery for purposes of Plaintiffs' response to the present Motion for Summary Judgment. ORDER (Doc. No. 76) at 2. Thus, Plaintiffs had the benefit of limited discovery in responding to the United States' Motion.

### Material Jurisdictional Facts

Plaintiffs do not challenge the United States' nine undisputed material facts (UMFs), Response at 3, but Plaintiffs set out 22 additional jurisdictional facts. Plaintiffs' facts cite both Federal Acquisition Regulations (FARs) and portions of the written contract between Dismas and the BOP. The United States argues that most of Plaintiffs' additional facts are "neither facts, nor supported by the record." Reply at 1.

Dismas operates a residential re-entry center (RRC) in Albuquerque, New Mexico, also known as a halfway house. In 2009, the BOP requested proposals for RRCs in Albuquerque, New Mexico. Doc. No. 78–1 at 1. In 2010, the RRC Contract[5] was awarded to the Dismas halfway house in Albuquerque, with an effective date of September 1, 2010. UMF No. 3. Later, the United States issued a Contract Amendment, effective April 30, 2012, incorporating a requirement that the BOP staff evaluate contractor performance to ensure contract compliance in accordance with FAR 42.15. Doc. No. 66–3.

Plaintiff Tilga was placed at the Albuquerque halfway house for a period of months in 2013, beginning on February 11, 2013. Complaint ¶ 34. Plaintiff Abeita was placed at the Albuquerque halfway house for a period of months in 2013, beginning on January 18, 2013. *Id.* ¶ 7. Defendant Prater appears to have been employed by the Albuquerque halfway house from January 9, 2013 to March 25, 2013.[6] Dismas Answer (Doc. No. 28) ¶ 8. Both Plaintiffs complain of sexual misconduct and other unlawful behavior by Prater during early 2013.

The BOP's "Interim Monitoring Results," dated February 5–6, 2013, indicate that a "contractor [at the Albuquerque halfway house] reported an allegation of staff misconduct,

---

[5] The Court's references to the "Contract" include the "Statement of Work" and other provisions attached as part of Exhibit A (Doc. No. 66–2) and Exhibit 1 (Doc. No. 78–1).

[6] Plaintiffs provide no evidence of how long Prater worked at the Albuquerque halfway house. Based on Dismas' Answer, the United States' Reply, and Plaintiffs' allegations, it appears that Prater worked for two to three months at the Albuquerque halfway house.

which involved the allegation of a male Resident Monitor, involved in inappropriate conduct with female residents." Doc. No. 81–2 at 4. As a result of the reported inappropriate conduct, the staff member's employment with the Albuquerque halfway house was terminated and the case was referred to the Office of Inspector General. *Id.* Prater was the staff member whose employment was terminated. Reply at 4. The parties have not informed the Court about what the Office of Inspector General did.

The BOP inspected the Albuquerque halfway house from September 2011 to August 31, 2012, and from September 1, 2012 to August 31, 2013, and issued reports. UMF No. 4. The Albuquerque halfway house generally received exceptional ratings, and few, if any, deficiencies were observed from September 2011 through August 31, 2013. Doc. Nos. 66–4, 66–5. In the 2012–2013 evaluation of the Albuquerque halfway house, the BOP reported one deficiency that did not pertain to Prater's alleged misconduct. However, by the end of the August 31, 2013 reporting period, Prater was no longer employed at the Albuquerque halfway house.

At all pertinent times, Dismas was an independent contractor of the United States. UMF No. 1. The Contract between the BOP and Dismas sets forth numerous guidelines, provisions, and performance requirements, including a "Statement of Work (SOW)," for the management and operation of the Albuquerque halfway house for federal offenders. Doc. No. 66–2 at 007. For example, a contractor is required to supply specific training to personnel on various topics. Doc. No. 78–1. The Contract and SOW contain provisions concerning personnel and inspections of contract facilities, as well as "important guiding principles for contract employees." Doc. No.

66–2.[7] The Court does not repeat those provisions here, but instead, discusses some of the pertinent contractual provisions and FARs in the Analysis section.

**Legal Standards**

Because the United States' Motion challenges the Court's jurisdiction, the Court does not address the merits of Plaintiffs' negligence claims. In deciding whether it has subject matter jurisdiction, the Court views all evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Garcia v. United States Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008) (citations omitted). The Court must grant summary judgment if the movant shows that no genuine disputes as to material facts remain and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

The United States is immune from suit unless it has consented to be sued or unless there is a waiver of its immunity. *United States v. Mitchell*, 445 U.S. 535, 538, *reh'g denied*, 446 U.S. 992 (1980). The FTCA, enacted in 1946, "constitutes a partial waiver of the federal government's sovereign immunity, which permits a claimant to sue the United States for the 'negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" *Hernandez v. United States*, 34 F. Supp. 3d 1168, 1176 (D. Colo. 2014) (citing 28 U.S.C. § 2675(a)).

If a claim against the United States falls within an enumerated exception to the FTCA's waiver of immunity, e.g., the discretionary function exception, sovereign immunity bars the claim. *Levin v. United States*, —— U.S. ——, 133 S.Ct. 1224, 1228 (2013). Sovereign immunity is strictly construed in favor of the sovereign. *Hart v. Dep't of Labor ex rel. United States*, 116

---

[7] Some of Plaintiffs' proposed facts are not material, and some include contested legal conclusions. While the contents of the contractual provisions are not in dispute, the parties contest the significance of the contractual provisions.

F.3d 1338, 1339 (10th Cir. 1997). *See also United States v. Williams*, 514 U.S. 527, 531 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"). Stated differently, a court should not extend a waiver of the United States' immunity beyond that which Congress intended. *United States v. Kubrick*, 444 U.S. 111, 117–18 (1979).

The United States argues that the discretionary function exception, 28 U.S.C. § 2680(a), applies to bar Plaintiffs' negligence claims against it. Plaintiffs contend that while they must demonstrate that the FTCA's waiver of immunity allows their negligence claims against the government, Defendant bears the ultimate burden of proving the applicability of the discretionary function exception. In support of this position, Plaintiffs cite cases from the Third and Ninth Circuit Courts of Appeals. Response at 12. In *Garcia*, the Tenth Circuit Court of Appeals stated that the "discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Garcia*, 533 F.3d at 1175 (citation omitted). *See also Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002). Thus, the Court examines if Plaintiffs have shown that the discretionary function exception should not apply to bar the negligence claims against the United States. If the discretionary function exception applies, the United States retains sovereign immunity and the Court must dismiss Plaintiffs' negligence claims against the United States for lack of subject matter jurisdiction. *Garcia*, 533 F.3d at 1175–76.

**Analysis**

I.    The Court's Previous Ruling

In accordance with *Bell v. United States*, 127 F.3d 1226, 1229 (10th Cir. 1997), the Court previously found that a voluntary contract between Dismas and the BOP, in contrast with the pertinent federal statutes, could impose mandatory, non-discretionary duties on government

7

employees to take specific actions. Doc. No. 56 at 36–37. *See also Downs v. U.S. Army Corps of Engineers*, 333 F. App'x 403, 408 (11th Cir. 2009) ("Contracts voluntarily entered into by the federal government can establish duties the breach of which are actionable under the FTCA.") Thus, the Court does not re-visit the question of whether contractual obligations can support Plaintiffs' negligence claims against the United States. The narrow question is whether Plaintiffs have demonstrated that the obligations in the 2009 Contract, including the 2012 Contract Amendment, defeat application of the discretionary function exception.

Plaintiffs also assert that FARs and BOP policy statements are "commands to Government employees to discharge duties, tasks, and behavior in a particular and specific manner which do not involve matters of discretion, choice, or options…." Response at 14. Thus, the Court reviews whether any of these non-discretionary requirements or regulations render the discretionary function exception inapplicable.

## II.   Discretionary Function Exception

The discretionary function exception has been described as "mark[ing] the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, *reh'g denied*, 468 U.S. 1226 (1984). This exception intends to protect policy making by the executive and legislative branches of government from judicial "second guessing." *Id.* at 814. If applicable, the discretionary function exception preserves the government's immunity even if the government employees were negligent. *Aragon v. United States*, 146 F.3d 819, 822–23 (10th Cir. 1998). In other words, the question of negligence is irrelevant in determining if the discretionary function exception applies. *Lopez v. United States*, 376 F.3d 1055, 1057 (10th Cir. 2004) (citations omitted).

8

In deciding whether challenged conduct falls within the discretionary function exception, the Tenth Circuit Court applies the two-part test set forth in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

> First, we ascertain the precise governmental conduct at issue and consider whether that conduct was "discretionary," meaning whether it was "a matter of judgment or choice for the acting employee." *Berkovitz*, 486 U.S. at 536. Conduct is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.*
>
> If the first element of the *Berkovitz* test is satisfied, we then consider the second element—whether the decision in question is one requiring the exercise of judgment based on considerations of public policy. *Id.* at 536–37. In so doing, we do not consider the employee's "subjective intent in exercising the discretion conferred by statute or regulation, but [the focus of the inquiry is] on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).
>
> If both the first and second elements of the *Berkovitz* test are met, the discretionary function exception to the waiver of sovereign immunity applies. Stated another way, if a plaintiff can establish that either element is not met, the plaintiff may proceed because the exception does not apply. *Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir. 2008).

*Garcia*, 533 F.3d 1170, 1176 (10th Cir. 2008) (applying the two-part test).

The Court first identifies "the precise governmental conduct at issue." *Varig Airlines*, 467 U.S. at 813 ("[T]he nature of the conduct ... governs whether the discretionary function exception applies in a given case."). Plaintiffs allege that the United States negligently contracted with Dismas for the placement of federal inmates, negligently placed Plaintiffs in custody at the Albuquerque halfway house, and negligently failed to provide proper training, supervision, and management in relation to the Contract with Dismas. Complaint, Counts I, II, and III. In

9

addition, Plaintiffs contend that the United States failed to manage or monitor the Dismas

Contract (and, therefore, to prevent harm to Plaintiffs while they were at the Albuquerque

halfway house) and that the United States failed to conduct adequate inspections of the

Albuquerque halfway house. Response at 16, 22, 23–24. Thus, "the precise governmental

conduct at issue" is: (1) negligent selection; (2) negligent placement; and (3) negligent

supervision of the Albuquerque halfway house. The Court analyzes Plaintiffs' allegations of

inadequate management and inadequate inspection under the negligent supervision claim.

### 1.   Negligent selection (Count II)

    a.   Was the United States' decision to award the Contract to Dismas'
        Albuquerque halfway house discretionary?

Plaintiffs argue that specific regulations constrained the United States' choice in selecting

the Albuquerque halfway house. Plaintiffs assert that the United States breached FAR § 9.104–1

that sets out factors to consider in selecting a contractor. Plaintiffs' UMF No. 19. Plaintiffs refer

to the "Solicitation Provisions Incorporated by Reference (Feb 1998)" ("Solicitation

Provisions"), which state, in part, that an "Award will be made to that offeror whose proposal,

conforming to this solicitation, is determined to be in the best interests of the Government, price

and other factors considered." Doc. No. 78–1 at 235. Plaintiffs emphasize only one of many

evaluative factors to be considered, e.g., "factors include:" "The offeror's compliance with those

minimum standards prerequisite to an affirmative determination of responsibility as defined by

§ 9.104–1 of the FAR."

Plaintiffs argue that the government could only award a contract to a "responsible

contractor," one that has a satisfactory performance record. Plaintiffs' UMF No. 21. Plaintiffs

assert that "[t]he United States was aware "of a number of deficiencies with Dismas Charities

Inc., between 2007–2012 but nevertheless awarded a contract and subsequent renewals to

Dismas in 2010 and thereafter." Plaintiffs' UMF No. 22. Plaintiffs refer to allegations in the

Complaint stating that "upon information and belief," the United States was aware of problems

of "rampant sexual abuse" and "inappropriate staff and resident contact" at "several Dismas

Charities Inc., facilities" throughout the United States. Complaint ¶ 95. Plaintiffs allege that,

notwithstanding the United States' purported knowledge of improper conduct at other Dismas

facilities, the United States still selected Dismas' Albuquerque halfway house to provide

residential reentry facilities for federal prisoners. *Id.* ¶ 97.

 Federal regulations require the United States to evaluate whether a contractor is

"responsible" for purposes of awarding a contract. But the regulations permit the United States to

consider a number of factors before exercising its judgment. In other words, the United States'

selection decision is replete with elements of judgment and choice. For example, the United

States examines the following factors to determine whether a contractor is "responsible" in

accordance with FAR § 9.104–1: 1) resources to perform the contract, b) proposed delivery or

performance schedule, c) performance record, d) record of integrity and business ethics,

e)  organization, experience, accounting controls, and technical skills, and f) technical equipment

and facilities. 48 C.F.R. § 9.104–1(a–g). The United States also assesses "[t]he offeror's

compliance with minimum or mandatory technical/management requirements," the offeror's past

performance, and the offerors' price. Doc. No. 78–1 at 235. The United States makes its choice

by determining which prospective contractor has "adequate" resources or the "necessary"

resources. *See id.* In addition, the United States selects a contractor after making a "comparative

rating of proposals" from various competitors. *Id.* at 235–36. Based on the proposals submitted,

the United States ultimately decides which contractor is the most qualified.

This is not a case where the evidence demonstrates that the United States had "no rightful choice" but to select a contractor other than Dismas. Nor do Plaintiffs identify any mandatory policy or regulation that limited the United States' discretion to award the contract to the Albuquerque halfway house. Plaintiffs do not show that the United States violated any of the FARs by selecting the Albuquerque halfway house. Although Plaintiffs summarily argue that the United States knew of improper conduct at _other_ Dismas facilities, there is no evidence that the Albuquerque halfway house was not a "responsible" contractor in 2010 or in 2012 when the Contract was modified.

The Court concludes that the United States' selection of the Albuquerque halfway house involved elements of choice and was discretionary.

> b.   Did the United States' decision to award the Contract to Dismas'
>       Albuquerque halfway house implicate policy concerns?

The Court recognizes the inherent problems in applying the second _Berkovitz_ prong.

> [N]early every government action is, to some extent, subject to
> policy analysis–to some argument that it was influenced by
> economics or the like. An added difficulty is that a failure to act
> can be a policy decision; and a failure to think about acting may
> still be susceptible to policy analysis.

_Duke v. Dep't of Agric._, 131 F.3d 1407, 1410 (10th Cir. 1997). The Court must ask if the government's decision to select responsible contractors implicates "the exercise of social, economic, or political [judgment]." _Id._ at 1411 (citation omitted).

The Solicitation Provisions state:  "The Contracting Officer cannot overemphasize the necessity for the initial proposal of an offeror to provide the Government with sufficient information identifying the offeror's best terms from a cost or price and technical/management standpoint." Doc. No. 78–1 at 235. In addition, the Solicitation Provisions say that "[o]fferors should recognize that Price … might contribute substantially to the … contract award decision."

*Id.* If competing contractors submit proposals equal in past performance and technical/management areas, price is even more important "in selecting the best value for the Government." *Id.* at 235–36. Thus, the United States clearly exercises economic judgment in its selection of a responsible contractor.

In addition, the United States considers whether the prospective contractors' submissions "meet[] the needs and objectives of the programs." *Id.* at 236. For example, the United States' selection decision depends, in part, on the "innovativeness, credibility and effectiveness of the [contractor's] proposed program for educating and interacting with the local community in order to acquire and maintain public support." *Id.* at 237. The United States also evaluates the contractor's proposal in terms of its effectiveness to assist offenders in their reentry into the community. Pertinent factors include the availability of programs for assisting the offenders with employment and housing and with life skills, including money management and parenting. *Id.*

The Court finds that the United States' selection decision involves balancing competing social and economic considerations pertaining to program services, effectiveness, and value, as well as the "fit" of the program in the local community. The Contract entered into between the BOP and Dismas emphasizes these social and economic considerations in describing the BOP's mission as:

> The contractor will ensure that the RRC operates in a manner consistent with the mission of the BOP. The mission is to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost efficient, appropriately secure, and provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

Doc. No. 66–2 at 007. In selecting a responsible contractor, the United States also weighs safety objectives, both in terms of the offender and the local community. The United States considers

practicalities like the contractor's available staffing, technical expertise, and the layout of the facility. The record sufficiently demonstrates that the United States' selection decision is subject to a myriad of public policy and economic considerations.

Moreover, the United States' more general decision to subcontract with residential reentry facilities for the placement of federal inmates is the type of decision that involves policy judgments. *See Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995) ("[t]he decision to hire an independent contractor to render services for the United States is precisely the type of decision that the exception is designed to shield from liability because it involves exercising judgment based on considerations of policy ...."); *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005) ("[A] decision to hire a contractor and the choice of a contractor are policy-based discretionary decisions.") (citation omitted). *Cf. Ashford v. United States*, 463 F. App'x 387, 395 (5th Cir. 2012) ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nations' prisons.") (citation omitted); *Threadgill v. United States*, 2011 WL 7429424, at *4, Civ. No. 11–cv–00094–REB–KMT (D. Colo. Dec. 1, 2001) (unpublished) ("inmate placement decisions, even those that ultimately lead to injury, routinely have been found to satisfy this second discretionary functions prong due to the myriad of policy considerations at issue") (citations omitted), *report and recommendation adopted,* 2012 WL 638793 (D. Colo. Feb. 28, 2012).

The Court concludes that the government's decisions to contract out for the placement of federal inmates in RRCs and to select Dismas are the kinds of discretionary determinations that Congress intended to protect from judicial second-guessing. Stated differently, these discretionary decisions implicate social, economic, and political policy judgments and are

protected by the discretionary function exception. Therefore, the Court lacks subject matter jurisdiction over the negligent selection claim against the United States. Accordingly, Count II ("Negligence in Contracting with Dismas Charities Inc.") will be dismissed as to the United States.

### 2.   Negligent placement (Count I)

a.   Was the United States' decision to place Plaintiffs at the Albuquerque halfway house discretionary?

Plaintiffs allege that the United States owed Plaintiffs "a duty to provide suitable quarters and [to] provide for [Plaintiffs'] safekeeping, care, and subsistence …." Complaint ¶ 101. Plaintiffs also contend that the United States "knew or should have known" of numerous instances of employee or resident misconduct at a Dismas facility in Las Cruces, New Mexico and at Dismas facilities in other states. *Id.* ¶¶ 106–110. Plaintiffs assert that notwithstanding the United States' purported knowledge of conditions occurring at Dismas facilities in other locations, the United States failed to exercise due care in placing Plaintiffs at the Albuquerque halfway house and that United States "negligently caused the sexual assaults on Plaintiffs" at the Albuquerque halfway house, where "the environment was ripe for sexual abuse and harassment of plaintiffs." *Id.* ¶¶ 114, 117, 118; Response at 2.

There is no question that the BOP is vested with the discretion to make placement and location decisions for the housing of federal inmates at appropriate halfway houses. *See Wedelstedt v. Wiley,* 477 F.3d 1160, 1165 (10th Cir. 2007) (citing 18 U.S.C. § 3621(b)). Plaintiffs identify no evidence of a specific regulation or policy provision that restricts the BOP's judgment or choice in placing Plaintiffs at the Albuquerque halfway house. Indeed, Plaintiffs concede that the pertinent federal statutes leave the implementation of the BOP officials' duties in placing and housing inmates to the BOP's discretion. Response at 15.

Moreover, while Plaintiffs summarily allege that the United States "was aware of a number of deficiencies" at other Dismas facilities and that the United States ignored known dangers at a "dangerous" facility, Plaintiffs' UMF No. 22, Response at 2, the argument is unsupported and unpersuasive. There is no allegation or evidence that the BOP knew of deficiencies at the Albuquerque halfway house or that the Albuquerque halfway house did not have "a satisfactory performance record" in 2013 when the BOP placed Plaintiffs there. S*ee* Response at 25. Plaintiffs do not state when the United States supposedly knew of dangers at the Albuquerque halfway house or how the United States learned that the Albuquerque halfway house was dangerous to the extent these allegations can be supported.

While Plaintiffs cite a number of provisions from the Contract between Dismas and the BOP and from federal regulations that Plaintiffs characterize as "mandatory" and "commands," Plaintiffs do not identify a specific, non-discretionary obligation that the BOP *violated* in placing Plaintiffs at the Albuquerque halfway house. For example, Plaintiffs' reliance on Contract provisions addressing issues of staff training, staff ratios, and other personnel matters, Plaintiffs' UMF Nos. 1–22, is not enough. "[T]he existence of a mandatory regulation or policy is meaningless without facts that the policies actually were violated." *Willett v. United States*, 24 F. Supp. 3d 1167, 1177 (M.D. Ala. 2014) (citation omitted).

The Court concludes that the United States' decision to place Plaintiffs at the Albuquerque halfway house was discretionary.

> b.  Did the United States' decision to place Plaintiffs at Dismas' Albuquerque halfway house implicate policy concerns?

The Court need not reach this question since Plaintiffs failed to address whether the BOP's placement decisions implicate policy concerns. However, the Court observes that the BOP's decision to place Plaintiffs at a halfway house is entwined with various social

considerations such as the goal of re-integrating prisoners into society. A reentry program such as the Albuquerque halfway house also alleviates the costs of keeping an inmate in prison. The Court finds that the United States' placement decision implicates social and economic concerns and that the United States is entitled to the protection afforded by the discretionary function exception. Therefore, the Court lacks subject matter jurisdiction over the negligent placement claim against the United States. Accordingly, Count I ("Negligence in Placing and Designating Plaintiffs to be in Custody at Dismas Charities Inc.") will be dismissed as to the United States.

### 3.   Negligent supervision (Count III)

a.   Was the (1) manner in which the United States managed the Contract and/or supervised operations at the Dismas' Albuquerque halfway house discretionary, and was the (2) manner in which the United States inspected Dismas' Albuquerque halfway house discretionary?

1.   <u>Management and Supervision</u>

Plaintiffs allege that various contractual provisions and regulations restrict the way that the United States managed the Contract and supervised operation of the Albuquerque halfway house. Stated differently, Plaintiffs' position is that the Contract between the BOP and Dismas incorporated mandatory, non-discretionary directives and regulations as to the BOP's management of the Contract with Dismas and its supervision of Dismas and the Albuquerque halfway house. *See* Plaintiffs' UMF Nos. 4, 6–10, 16– 18, 20; Response at 21 ("Based on breaches of the non-discretionary requirements of the FAR by Defendant [United States] concerning the contract management with regard to Dismas, the first prong of the *Berkovitz* test is not satisfied ….").

Plaintiffs refer to Contract provisions and policy statements that address "staff integrity," staff offender ratios, education, "BOP training" performance reviews, maintenance of personnel records, and Dismas employees' "clearance" to work. Plaintiffs' UMF Nos. 6, 7. Plaintiffs also

17

rely on Contract language that the contractor (Dismas) was to: 1) report all criminal activity related to the performance of the contract to appropriate law enforcement agencies; and 2) ensure that a policy prohibits sexual abuse/misconduct by federal offenders against federal offenders. *Id.* Nos. 9, 10. Plaintiffs cite a November 2, 1999 U.S. Department of Justice "Program Statement" providing that criminal history checks "must be done on all contract employees … who have contact with federal inmates." Doc. No. 78–7 at 2 (¶5). After a criminal history check, a Community Corrections Manager "will approve conditionally a proposed contract employee to work with federal inmates" in accordance with established criteria. *Id.* at 1 (¶2a). The program objective is that the community corrections contract employee will be screened effectively to ensure acceptability to work with federal inmates. *Id.* (¶3). Plaintiffs' UMF Nos. 17, 18.

Plaintiffs allege that the United States breached the above-described regulations and provisions in a number of ways, *e.g.,* Plaintiffs argue that the United States "breached regulations by failing to reject the contractor's (Dismas) services for failing to comply with contractual provisions which required Dismas to prohibit its employees (Prater) from engaging in sexual behavior or extorting offenders placed at the residential reentry facility." Response at 21. According to Plaintiffs, the BOP "further breached regulation [48 C.F.R. §] 46.407(b) by failing to afford the contractor the opportunity to correct or address the nonconforming service." *Id.* In addition, Plaintiffs state that the BOP "neglected to maintain a close supervision and monitoring of the activities and staff hiring and training [at the Albuquerque halfway house] as mandated in the [C]ontract." Response at 2.

The Court already determined that the United States acted within its discretion in contracting out for residential reentry services. The BOP weighed policy and economic factors in deciding that private contractors like Dismas could fulfill the BOP's mission of protecting

18

"society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient," and that provide other needed services for offenders to re-integrate into society.

Similarly, the Court now finds that, in accordance with the Contract, the United States acted within its discretion in delegating responsibility for contract compliance and for the day-to-day supervision and management of the Albuquerque halfway house to Dismas. The Contract provisions, and regulations, relied on by Plaintiffs, make clear that the BOP transferred these responsibilities to Dismas and that it was up to Dismas to determine how it would fulfill the BOP's goals and mission statements. For example, the BOP expressly delegated to the contractor the responsibility of "ensur[ing] that the RRC operates in a manner consistent with the mission of the BOP." Doc. No. 66–2 at 007. The contractor is to comply with all requirements of the contract's Statement of Work and the BOP's mission statement. *Id.* at 010. The Contract specifically assigns responsibility to the contractor for the "appropriate supervision of federal offenders and the orderly running of the RRC." *Id.* at 012.

Under the Contract, Dismas has to furnish personnel and equipment for performance of "all aspects of the contract." *Id.* Dismas is obligated to determine the employment qualifications for non-supervisory staff positions. *Id.* at 011. Dismas is to provide a "written personnel manual" for its facility. The BOP provides guidance and some minimum requirements to include in Dismas' policies and procedures, but Dismas supplies the detailed, day-to-day operational procedures and oversees operation of the Albuquerque halfway house. Doc. No. 78–1 at 34–35. Neither the Contract's requirements nor the pertinent regulations specifically address how a contractor is to ensure that its employees comply with federal law, how a resident is to report employee abuse, how the contractor is to respond to complaints that its employees have engaged

in sexual misconduct, or when a contractor can elect to terminate a staff member's employment for misconduct. And, nothing in the Contract or regulations indicates that the BOP must "maintain close supervision and monitoring" of the Albuquerque halfway house or that the BOP must regularly check Dismas' operation of the Albuquerque halfway house to assess Contract compliance. *See, e.g.,* Doc. No. 66–2 at 009–010 (while the BOP reserves the right to have various staff monitor contract compliance, the "contractor has the responsibility to ensure proper management and oversight of their program.").

In sum, Dismas was tasked with complying with the Contract terms and with developing policies and procedures in managing and supervising the Albuquerque halfway house. *See, e.g.,* Doc. No. 78–1 at 37. The Contract repeatedly emphasizes that Dismas, as the contractor, is responsible for compliance with the Contract, satisfaction of the BOP's mission, management of the contactor's facility, and supervision of the contractor's employees. None of the BOP Contract terms, policy statements, or federal regulations, relied on by Plaintiffs, prescribe "a specific course of action" for the BOP to follow in ensuring Contract compliance or in safeguarding inmates at the Albuquerque halfway house. The BOP transferred these types of duties to Dismas. Doc. No. 66–2 at 007. "When an agency determines the extent to which it will supervise the … procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig Airlines*, 467 U.S. 797, 819–820 (1984).

The Court concludes that the United States' decisions to transfer responsibility to Dismas for Contract compliance and for the supervision and/or management of Dismas' Albuquerque halfway house were discretionary.

2.   Inspection

The essence of Plaintiffs' inspection claim is that the Contract and 2012 Contract Amendment contain requirements governing inspections and that the BOP failed to comply with these requirements. Response at 4–6. In addition, Plaintiffs rely on a number of FARs that they believe set forth mandatory requirements that the United States breached. *Id.* at 16–19.

Plaintiffs argue that they reported to Dismas "the Dismas employee's assault and misconduct in March and April 2013." However, these allegations are in dispute. Plaintiffs also state that their tort claims notice to the BOP was sent in May 2013. *Id.* at 5. Plaintiff Tilga's FTCA claim was signed on May 16, 2013, Doc. No. 78–5, although it is not certain when the government received notice of the claim. In any event, the undisputed facts show that Prater's employment was terminated before Plaintiffs sent the tort claim notice to the BOP.

Plaintiffs assert that by failing to identify the "glaring nonconformance of the contract by Dismas, during the inspection period 9/1/2012 – 8/31/2013," the BOP breached mandatory, non-discretionary requirements and regulations. But, that argument incorrectly implies that the BOP was responsible in the first place for Dismas' identification and reports of staff misconduct. It also wrongly suggests that the BOP oversaw the details of how Dismas handled reports of employee complaints and decided on appropriate personnel actions. The manner in which Dismas operated its facility, established procedures for reporting misconduct, and determined the appropriateness of certain disciplinary action were discretionary responsibilities that the BOP delegated to Dismas. If Dismas elected to immediately terminate Prater's employment before requesting an additional investigation in accordance with its own policies, procedures, and practice, it is not clear how this amounts to a breach by the BOP.

There is no evidence that BOP had an obligation to take affirmative action to conduct investigations of employee misconduct at Dismas' facility. The BOP made decisions on the

depth and frequency of monitoring contract compliance in accordance with the BOP's mission and available resources. Doc. No. 66–1 at ¶¶ 4, 12. The BOP was not required to supply staff to Dismas on a daily basis to oversee Dismas' operations. The BOP "reserves the right to determine the resources, e.g., number and type of staff, number of working days necessary to perform all inspections, and monitoring visits …." Doc. No. 66–2 at 015. The BOP's feedback to the contractor "*may* assign deficiencies which the contractor will remedy." *Id.* (emphasis added). "A deficiency is determined when evidence indicates that the contractor has failed to meet the performance requirements of the contract. The evidence that supports a  deficiency will be factually sufficient to lead a knowledgeable, reasonable person … to come to the same conclusion as the reviewer." *Id.* The language addressing "BOP Inspections" does not amount to "commands" to the BOP; rather, the language calls for the use of the BOP's judgment.

Moreover, the 2012 Contract Amendment requiring inspections of contractor performance emphasizes that the contractor's services were not directly supervised by the BOP. "The services, although not directly supervised, shall be reviewed by Federal Bureau of Prisons (BOP) staff to ensure contract compliance." Doc. No. 66–3 at 002. The evaluation criteria include a number of factors for the BOP to utilize in assessing the contractor's performance including effectiveness of programs, adequacy of community relations, and competency of trained personnel. The evaluative factors do not dictate how the BOP must rate a contractor's performance. Instead, these factors allow the BOP to exercise significant discretion and judgment in evaluating the strengths and weaknesses of a contractor during an inspection.

Plaintiffs' reliance on various FARs does not compel a different finding. Certain FARs set forth responsibilities of "contracting offices" to ensure that a nonconformance is identified and to establish the significance of a nonconformance. Response at 17. Other FARs expressly

discuss the professional judgment "local procurement officials" use to obtain the "best value" product of service. 48 C.F.R. § 1.102. FARs allow "local procurement officials to take independent action based on their professional judgment." *Id.* § 1.102–2(c)(2). Contracting officers are permitted wide latitude to exercise business judgment in ensuring performance of necessary actions for effective contracting. 48 C.F.R. § 1.602–2.

The Court does not find Plaintiffs' reliance on two Eighth Circuit Court of Appeals' decisions persuasive. In *Appley Brothers v. United States*, 7 F.3d 720 (8th Cir. 1993), "farmers and grain elevators who sold or stored grain at the Bird Grain [Company] sued the government under the FTCA for negligent inspection. Inspectors from the United States Department of Agriculture (USDA) examined Bird Grain's operations, cited Bird Grain for a number of violations, including inventory shortages, and directed Bird Grain to eliminate the shortages. At a second inspection, Bird Grain was cited for continuing problems but the inspectors did not report whether Bird Grain still had inventory shortages. *Id.* at 721–22. A third inspection resulted in suspension of Bird Grain's federal license to operate and liquidation of its inventory. The plaintiffs argued that the inspectors had no discretion at the second inspection but to issue a specific form to the Secretary of Agriculture alerting the Secretary of the inventory shortage. Had this been done, the Secretary might have revoked Bird Grain's license before Bird Grain incurred additional expenses and/or losses.

In *Appley Brothers,* the Court considered language of a USDA mandate stating that "in all instances" where a reported deficiency was not "completely cleared," the examiner had to issue a specific form alerting the Secretary of Agriculture of the continuing violation. *Id.* at 723. The Eighth Circuit Court held that while the Secretary's decision whether to revoke Bird Grain's

license was discretionary, the inspectors' failure to issue the required form after the second inspection was not discretionary. *Id.* at 725–26.

The *Appley Brothers* decision has no applicability to the facts of this case. There is no similar mandate that BOP inspectors failed to follow. The Contract and 2012 Contract Amendment require the BOP to conduct inspections which it did. However, the Contract provisions do not require the BOP inspectors to have taken a specific step that the BOP neglected to do. In other words, this is not a situation where an inspection had uncovered a serious nonconformity that Dismas failed to correct and the BOP then conducted a subsequent inspection that neglected to address an ongoing deficiency.

Moreover, in *Appley Brothers,* the conduct alleged to have been negligent and to have caused injury to the plaintiffs *was* related to the government's failure to follow inspection requirements. The inspectors' failure to report the continuing deficiency resulted in Bird Grain's continued operations and ultimately, increased damages to the plaintiffs. That is not the case here. The conduct alleged to have been negligent, the BOP's inadequate inspections of Dismas in the face of "glaring" deficiencies, could not have resulted in or contributed to Plaintiffs' injuries which Plaintiffs had suffered before the BOP conducted its investigation. Dismas had terminated Prater's employment before the government was required to have completed its 2012–2013 inspection of Dismas and Dismas no longer employed Prater when the government received notice of Plaintiff's tort claim in about May 2013. *See Franklin Sav. Corp. v. United States,* 180 F.3d at 1124, 1132–33 (10th Cir.) (even if there were specific, mandatory requirements that the government was required to follow, the court rejected the plaintiffs' claims because their injuries were not caused by a violation of those requirements), *cert. denied*, 528 U.S. 964 (1999). *See also Clark v. United States*, 2014 WL 7653392, at *13, Civ. Nos. 12–1160 MV/KBM, 12–1176

MV/KBM, (D.N.M. Sept. 25, 2014) (finding that the conduct alleged to have been negligent and to have caused injury to the plaintiffs was unrelated to the government's failure to conduct or maintain records of annual inspections) (unpublished).

The Eighth Circuit Court's decision in *McMichael v. United States*, 751 F.2d 303, 304 (8th Cir. 1985) is also distinguishable. In *McMichael*, the Department of Defense hired Celesco, an independent contractor, to produce explosive photo-flash cartridges. The plaintiffs sought to recover for deaths and injuries caused by an explosion at a Celesco munitions plant. In *McMichael*, unlike the present case, "the Defense Department had three quality assurance inspectors constantly on site at the Celesco plant." *Id.* at 307. The inspectors also had "important responsibilities" for assuring safety. *Id.* In *McMichael,* the parties had stipulated for purposes of summary judgment that the inspectors had failed to enforce numerous safety requirements. Pertinent regulations and the Celesco contract authorized the government to stop performance on the contract if safety violations were discovered. *Id.* Under those circumstances, the Eighth Circuit Court held that the government's conduct in failing to take action in light of the detected safety violations was not protected by the discretionary function exception.

Plaintiffs' reliance on *Schmoldt v. Wadco Indus. Inc.*, 941 F. Supp. 905 (D. Az. 1996) does not dictate a different result. In *Schmoldt*, the government incorporated safety standards in its contract stating that the contractor "shall comply" with a specific safety standard and that the government "shall notify" the contractor of noncompliance with that safety standard. *Id.* at 908. No similar mandatory language is found in the contract between the BOP and Dismas pertaining to the way the BOP conducts inspections.

Plaintiffs have not explained how the United States violated any specific, non-discretionary mandates pertaining to the BOP's inspections of Dismas. Moreover, there is no

showing that the United States' purported failure to follow inspection procedures could have

caused Plaintiffs' injuries. The Court has reviewed the Contract provisions and FARs and finds

that none of the contractual provisions and regulations prescribe a specific course of action that

the BOP had to follow. For example, while the United States must perform inspections and

report findings, there are no provisions or regulations specifying the exact manner in which the

government must conduct inspections.

The Court concludes that the challenged conduct involving the BOP's inspections of

Dismas involved elements of judgment and choice and was discretionary.

> b. Did the United States' management, supervision, and inspection of Dismas
> and the Albuquerque halfway house implicate policy concerns?

>> 1. Management and Supervision

The United States' decision to delegate to Dismas the day-to-day management and

supervision of the Albuquerque halfway house is grounded in policy considerations, including

the government's exercise of social, economic, and political judgment. For example, the BOP

evaluates whether an independent contractor such as Dismas is better equipped than the federal

government to operate a residential reentry center. The government's decision to transfer

management and supervision of a halfway house to the contractor is made in light of the

government's available resources, the BOP's mission, and the need to protect both the prisoners

and society. In other words, policy-based factors such as cost, safety, community relations, and

security all inform the government's decision to leave a facility's daily management and

operation in the hands of the independent contractor. *See Guile*, 422 F.3d at 231 ("supervision of

a contractor's work, including the degree of oversight to exercise, is inherently a discretionary

function"). *See also Walding v. United States*, 955 F. Supp. 2d. 759, 782 (W.D. Tex. 2013)

("Courts have also generally held that decisions relating to hiring, training, and supervision of

employees usually involve policy judgment of the type Congress intended the discretionary function exception to shield.") (citation omitted).

The Court concludes that the United States' decision to delegate responsibility to Dismas for the management and supervision of the Albuquerque halfway house is susceptible to a number of policy considerations and is the type of conduct that the discretionary function exception was designed to shield.

2.  Inspection

Plaintiffs argue that the "BOP's failures to inspect the contractor's facilities, issue monitoring reports and evaluations and approve hiring and training of competent staff, was not based on social, economic or political policy …." Response at 22. However, the evidence shows that the BOP did conduct inspections of Dismas and did issue reports. And, contrary to Plaintiffs' position, the evidence indicates that Dismas, not the BOP, was directly responsible for the hiring and training of competent staff for the Albuquerque halfway house. *See* Doc. 66–2 (Chapter 2–Personnel); Doc. No. 78–1 (the contractor provides training to staff in accordance with contractor's Employee Standards of Conduct).

The Contract states that the BOP reserves the right to have various staff monitor contract performance, to make announced and unannounced inspections of the facility, and to determine the resources, staff, and hours to devote to inspections and monitoring visits. Doc. No. 66–2 at 009, 015. The Contract *permits* the BOP to investigate any incident pertaining to contract performance. *Id.* at 009. Specific contractual provisions indicate that the objectives of BOP's inspections "are to ensure that the contractor is in compliance with applicable laws, regulations, policies, contract requirements, and that fraud, waste, abuse, mismanagement, and illegal acts are prevented, detected, and reported. *Id.* at 015. In accordance with the pertinent contractual

27

provisions, the BOP maintains some degree of oversight over Dismas through conducting periodic inspections, but the BOP ultimately weighs its policy-based goals against practical considerations of staffing and resources in determining the appropriate amount of oversight to exercise. *See Varig Airlines*, 467 U.S. at 819–820 (discussing government's oversight of enforcement of regulations and the balancing of program objectives against practical considerations like staffing and funding).

The language in the Contract and the 2012 Contract Amendment do not prescribe a specific course of action that the BOP must follow with respect to conducting inspections. Although the contractual provisions provide guidance as to a number of factors the BOP should consider during inspections, Doc. No. 66–3 at 002–003, the Contract Amendment does not prevent BOP from considering other factors. The Contract Amendment sets forth questions the BOP may consider in evaluating the contractor's performance but it does not inform the BOP of how it must conduct an inspection or what remedial actions the BOP must take if it determines a contractor's performance is unsatisfactory. *See id.* at 004. Instead, the BOP's inspection decisions are imbued with policy–based considerations.

The Court concludes that financial, social, and policy concerns guide the BOP's determination of how to conduct inspections of a contractor's facility and how to address deficiencies. Thus, the BOP's inspection decisions are susceptible to policy considerations and the type of conduct protected by the discretionary function exception. Therefore, the Court lacks subject matter jurisdiction over the negligent supervision claim against the United States, including allegations of improper management and improper inspection. Accordingly, Count III ("Negligent Hiring, Retention, Supervision and Training of Dismas Charities Inc.") will be dismissed as to the United States.

IT IS THEREFORE ORDERED that THE UNITED STATES OF AMERICA'S

MOTION FOR SUMMARY JUDGMENT FOR LACK OF SUBJECT MATTER

JURISDICTION AND MEMORANDUM IN SUPPORT (Doc. No. 66) is GRANTED with the

result that Plaintiffs' Count I, II and III negligence claims against the United States will be

dismissed.

_____

SENIOR UNITED STATES DISTRICT JUDGE